Christian, J.
This case is before us upon a writ of error to a judgment of the Circuit court of the city of Richmond, affirming a judgment of the police justice of said city, imposing a fine upon the plaintiff in error for running its cars propelled by steam upon Broad street east of Belvidere street, in violation of a city ordinance passed September 8th; 1873.
This ordinance is entitled “an ordinance to amend the third section of an ordinance to regulate the use of Broad street by the Richmond, Fredericksburg and Potomac^ Railroad Company;” and is in the follow-” ing words:
“Be it ordained by the council of the city of Richmond, *that section three of an° ordinance passed May 13th, 1872, entitled an ordinance to regulate the use of Broad street by the Richmond, Fredericksburg and Potomac Railroad Company, be amended and reordained so as to read as. follows:
“Sec. 3. That on and after the 1st day of January 1874, no car, engine, carriage, or other vehicle of any kind, belonging to or used by the Richmond, Fredericksburg and Potomac Railroad Company, shall be drawn or propelled by steam upon that part of their railroad or railway track on Broad street east of Belvidere street in said city. The penalty for failing to comply with this section shall be not less than one hundred dollars nor more than five hundred dollars for each and every offence, to be recovered before the police justice of the city of Richmond. ’ ’
*41 The plaintiff in error (the railroad company) admits the violation of this ordinance, but contends that the ordinance is invalid, because it is in violation of its chartered rights.
On the other hand, the city of Richmond claims that it has the right, not only under the general police power vested in it as a municipal corporation, which antedates and overrides the charter of the railroad company, but under authority conferred upon the city council, by act of the legislature amending the city charter, to the exercise of the complete and absolute authority to regulate the use of Broad street by the said railroad company.
The legislature, by an act providing a charter for the city of Richmond, approved May 24th, 1870, vested in the council of said city the power “to prevent the cumbering of streets, avenues, walks, public squares, lanes, alleys or bridges, in any manner whatsoever,” and the power “to determine and designate the route *and grade of any railroad to be laid in said city, and to restrain and regulate the rate of speed of locomotives, engines and cars upon the railroads within said city, and may wholly exclude said engines or cars if they please; provided no contract may be thereby violated. ’ ’
It is insisted by the counsel for the railroad company, that this provision of the charter of the city of Richmond cannot be executed against it, because it is excluded from its operation by the proviso; inasmuch as by its charter it has the right by contract forever, and under all circumstances, to run its cars by steam through the whole length of Broad street to its depot and terminus at the corner of Eighth and Broad streets.
The question therefore we have to determine is, whether the ordinance of the city council is void and invalid because it is in violation of the chartered rights of the said railroad company and therefore violates the obligation of the contract between the state and the said railroad company, as evidenced and declared by said charter of incorporation.
We are therefore called upon to examine carefully the provisions of that act, and to determine whether the state has by an ever-continuing contract committed itself for all time to this railroad compa ny to run its cars propelled by steam through the heart of the capital city of the commonwealth, and through the most important and populous street of that city, without regard to the safety, comfort and convenience of its citizens, and without regard to the general prosperity and welfare of the whole city.
The Richmond, Fredericksburg and Potomac Railroad Company was incorporated by an act of the legislature of the state passed February 25th, 1834.
This act provided, that under the direction of certain ^persons therein named, books should be opened at Richmond, Fredericksburg and other places, “for the purpose of receiving subscriptions to the amount of seven [hundred thousand dollars, in shares of one hundred dollars each, to constitute a joint capital stock, for the purpose of making a railroad from some point within the corporation of Richmond, to be approved by the common council, to some point within the corporation of Fredericksburg ; and for the purpose of extending the same, should the company hereby incorporated, at the commencement of the work or at any time afterwards, deem it advisable to do so, from its termination within the town of Fredericksburg to the Potomac, river or some creek thereof, and for providing everything convenient and necessary for the purpose of transportation on the same.” Sess. Acts 1834.
The only other section of the act (which comprises thirty-eight sections), necessary to be referred to, is the twenty-fourth section, which is as follows:
“Sec. 24. The president and directors, or a majority of them, shall have power to purchase with the funds of the said company, and place on the railroad constructed by them under this act, all machines, wagons, vehicles, carriages and teams of any description whatsoever, which they may deem necessary and proper for the purpose of transportation. ’ ’
These are the two sections of the act upon which the railroad company relies, to show that the ordinance of the city council is void and invalid as to it, because they create a contract which is perpetual with the state, permitting them to run their engines for all time on Broad street. These two sections will be considered more particularly presently.
The record further shows, that on the 22d December 1834, at a meeting of the president and directors of the *Rich~ mond and Fredericksburg Railroad Company, the following preamble and resolutions were adopted:
“Whereas, by the act incorporating this company, it is requisite that the point at which the railroad terminates, within the corporation of Richmond, should be approved by the common council, and it appears to the board most expedient to conduct the same from the Richmond turnpike along H street (now Broad street) to a point at or near the intersection of the said street and Eighth street, and for the present to terminate the same by suitable connections with the contemplated warehouses and workshops of the company on lots Nos. 477, 478, purchased by them from John Heth;. Therefore,
“Be it Resolved, That the approbation of the city council be requested to the above plan.
“Resolved, That the president" cause a copy of the foregoing resolutions to be transmitted to the city council, ’ ’ &c.
In response to these resolutions of the president and directors of the Richmond, Fredericksburg and Potomac Railroad Company, the city council on the 23d December 1834 adopted the following preamble and resolutions:
“Whereas, by a resolution of the president *42 and directors of the Richmond, Fredericksburg and Potomac Railroad Company, submitted to the common council, it appears that it is deemed most expedient by the president and directors to conduct the said railroad from the Richmond turnpike along H street, to a point .at or near the intersection of said street and Eighth street, and for the present to terminate the same by suitable connections with the contemplated warehouses and workshops of the company on lots Nos. 477, 478, purchased by them from John Heth: ^“Resolved, That the common council do appro.ve the proposed location of the said railroad, and the present termination of the same as described in the foregoing resolution, and authorize the prosecution of the said work within the limits of the .city on the above locations: provided, that in locating the said railroad no injury shall be done to the water pipes now laid in and along said street: provided further, that the ■corporation of Richmond shall not be considered as hereby parting with any power or chartered privilege not necessary to the said railroad company for constructing said railroad and connecting the same with the depot of said company within the limits of the city.”
These proceedings of the city council, and the two sections of the act of incorporation above quoted, constitute the foundation of the claim on the part of the railroad company, of a perpetual and' irrepealable contract between the state and that company, by which for all' time, and under all circumstances, they may run their cars propelled by steam through one of the principal and most populous streets of the capital city cf the commonwealth.
It will be conceded, that if such contract exists at all, it originated in the two sections of the act of incorporation and proceedings thereunder above quoted. These, therefore, require a careful and candid consideration.
It is apparent that by the first section of the act incorporating the railroad company, the legislature delegated to the city council cf Richmond the powers to select the terminal point within the corporate limits of the city, and under this act the railroad company could only locate its terminus at such point within the city of Richmond as should approved by the city council. This plain construction of the first section is recognized *and acted upon by the president and directors of the railroad company when they declare, in the resolutions adopted by them and sent to the city council, that “it is requisite that the point at which the railroad terminates within the corporation of Richmond should be approved by the city council.”
And the city council in approving the terminal point, suggested by the president and •directors of the Richmond, Fredericksburg and Potomac Railroad Company, adopted it (the intersection of Eighth and Broad streets) as the then ‘ ‘present termination cf the same,” and upon the express condition “that the corporation of Richmond shall not be considered as hereby parting with any power or chartered privilege not necessary to the railroad company for constructing said railroad, and connecting the same with the depot of said company within the limits of the city.”
Upon this construction of the first section, and with these plainly expressed conditions, asserting in emphatic terms the chartered powers and privileges of the corporation of the city of Richmond, the railroad company adopted the corner of Eighth and Broad streets as the terminal point within the city of Richmond from which they should build their road, and on which they built their depot and warehouses, &c.
In the resolutions approving the terminal point (without which approval the railroad company could not have commenced their work beginning within the corporation of Richmond,) we find the express and positive reservation of all the chartered rights and powers of the municipality. These included an absolute and entire control over the streets of the city, excepting only the privilege to the railroad company of constructing and connecting their road with the depot on Broad street. Not a syllable is recorded about the mode or *manner of transportation, whether by horsepower or steam, the entire regulation of that subject being reserved to the corporation with the rest of its chartered powers.
It is argued, however, that the twenty-fourth section of the act of incorporation above quoted, giving to the company the power “to purchase and place upon their road all machines, vehicles, &c., of any description whatsoever, which they may deem necessary and proper for the purposes of transportation,” confer upon the company the authority to run locomotives within the city limits. This reasoning is altogether inconclusive and illogical. If the assent of the city council had been absolute and unconditional, this view would not have been sound. It is manifest that this twenty-fourth section is a general provision extending to the whole road. The road passes through '■ the counties of Henrico, Hanover, Caroline and Spotsylvania. The legislature did not require these counties to give their assent to the construction of the road, because these counties have no chartered rights and privileges; and in these counties the railroad company acquired not only a right of way, but an absolute right of property in their road, and necessary property acquired in. those counties, because, as empowered by their charter, they condemned the lands of individuals for these purposes, and paid them an equivalent in money. But the legislature did require the assent of the city authorities before the company could lawfully pass its boundaries. Within the limits of the city of Richmond all the right which the company acquired was the right of way over the street for transportation of passengers and freight. This right was subject to the right inherent in the municipal authorities to control the use of the streets, and to protect the safety, comfort and *43 general welfare *of the citizens of the municipality. The general right, therefore, to use machines on their road, as provided in this twenty-fourth section, does not embrace the right, against the consent of the city authorities, to use locomotives on •one of the principal and most populous streets of the city.
It is worthy of remark, that the city council have, ever since its approval of the terminal point in 1834, constantly asserted their right to prohibit the introduction of steam engines into the city. In 1845, after much contention for years on the subject between the railroad company and the city authorities, on motion of Mr. Wickham, one of the most distinguished citizens, as well as one of the most learned lawyers of the city, the following resolution prepared by him was adopted by the city council.
“Resolved, That the council of the city of Richmond not only maintains its right to prohibit the use of locomotives within the city whensoever it shall appear expedient to do so, but in contradiction to all allegation to the contrary they do most positively deny all responsibility to indemnify the railroad company for any such exercise of its legitimate powers. They admit no other right in this respect on the part of that company but to a favorable and indulgent consideration— a claim which, from its nature, becomes less :and less the longer it is favored.”
Up to the present time the city council have repeatedly and constantly asserted their right to prohibit the use of locomotives within the city limits, which they might or might not exercise in their own discretion, according as the safety and welfare of the citizens should require.
This right was as firmly maintained and confidently asserted under the general chartered powers, and the ^rights inherent in every municipal corporation to guard and protect the safety of the citizens, and to regulate the use of the streets of the city, from the very inception of the construction of the railroad, as it is now, when, by the amended charter above referred to of the city, special power is conferred upon the city council to regulate the rate of speed of locomotives, engines and cars upon the railroads within the city, and to wholly exclude said engines and cars if they please; provided no contract will be thereby violated. ’ ’ But the railroad company confidently rely upon this proviso; and it is earnestly argued, that the adoption by the legislature of this proviso was a recognition of the claim of the railroad company to run their locomotives on Broad street for all time. This pretension is unreasonable and illogical. The only fair and legitimate inference to be drawn from the adoption of this proviso is, that the legislature, aware of the controversy between the city authorities and the railroad company on this subject, left it as an open question for the courts to decide, whether the chartered powers and privileges of the corporation of Richmond had been so modified and restricted by the act of incorporating the Richmond, Fredericksburg and Potomac Railroad Company, as to deprive the corporate authorities of the right to prohibit the company from running steam engines on the streets of the city. This question was not intended to be decided by the legislature, but was reserved as a judicial question. The legislative declaration by the amended charter was simply that the city council should have power to regulate the speed of locomotives and remove them altogether, if in so doing no contract was violated. And the question as to the violation of the contract rights of the company is by that proviso submitted *to judicial determination; and that is the main question now submitted to this court.
Now it must be borne in mind that when the act incorporating the Richmond, Fredericksburg and Potomac Railroad Company was passed by the legislature in 1834, the charter of the city of Richmond was then in existence; and certainly none of the provisions of that charter were repealed by the adoption of the act incorporating the Richmond company; but remained in full force and effect. By the charter of the city, the corporate authorities are invested with the power to make and establish such bylaw, rules and ordinances, not contrary to the constitution or laws of the commonwealth, as shall by them be thought necessary for the good ordering and government of such persons as shall from time to time reside within the limits of said city and corporation, or shall be concerned in interest therein.” Not only were they invested with these chartered rights, specifically conferred by the terms of the charter, but with all those powers and privileges which by law are inherent in every municipal corporation, to guard the safety and promote the comfort and welfare of the citizens of the corporation.
The railroad company accepted the charter not only subject to existing laws and chartered corporate powers vested in the corporation of Richmond, but they adopted the terminal point of their road within the corporate limits approved by the city council, with the express reservation “that the corporation of Richmond shall not be considered as parting with any power or chartered privilege not necessary to the railroad company for constructing the said road, ’ ’ &c.
It is conceded that a charter granted to a corporation by the state may be, according to its terms, a contract between the state and corporation, the obligation of *which cannot be impaired by subsequent legislation; but at the same time while this is conceded, it is also certainly true that corporations, like natural persons, are subject to remedial legislation, and amenable to general laws. Private corporations, even without any express reservation of the powers over them by the legislature in their charters, are subject, like individuals, to be restrained, limited and controlled in the exercise of their powers by such laws as the legislature may pass, based upon the principles of safety to the public.
It is well settled, and cannot now be dis- *44 pitted, that the legislature may control the actions, prescribe the functions and duties of corporations, and impose restraints upon them to the same extent as upon natural persons, subject, of course, to the limitation of not impairing the obligation of contracts made between the corporation and the state. See Redford on Railways 428, and note and cases there cited.
“A corporation is,” in the language of Chief Justice Marshall, in Dartmouth College v. Woodward, 4 Wheat. R. 518, “the mere creature of the law; it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence.” And as was expressed by the same great judge in Providence Bank v. Billings, 4 Peters’ R. 514: “Any privileges which may exempt a corporation from the burdens common to individuals do not flow necessarily from the charter, but must be expressed in it, or they do not exist.”
A cardinal rule, in the interpretation of charters of incorporation, is thus laid down by Mr. Justice Grier in Richmond Railway Co. v. The Louisa Railway Co., 13 How. U. S. R. 71. “Public grants are to be construed strictly, and any ambiguity in -the terms of the grant *must operate against the corporation and in favor of the public; and the corporation can claim nothing but what is clearly given by the act. ’ ’
In Charles River Bridge v. Warren Bridge, 11 Peters’ R. 420, 548, Chief Justice Taney enforcing the same rule said: “The continued existence of a government would be of no great value, if by implications and presumptions it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to privileged corporations.” And this eminent jurist concludes his discussion of the subject by the declaration, “that no claim in any way abridging the most unlimited exercise of the legislative power over persons natural or artificial can be successfully asserted except upon the basis of an express grant in terms or by necessary implication.”
Applying these rules of law and canons of interpretation to the charter of the Richmond, Fredericksburg and Potomac Railroad Company, it is clear that there is nothing in the privileges and franchises conferred by that charter which prevents the legislature either of itself (or through a municipal corporation to which it has delegated its authority), from prescribing rules and regulations for the exercise of those privileges and franchises. And it is equally clear that the authority granted in the charter of incorporation, to construct a road “from a point within the corporation of Richmond, to be approved by the city council to a point within the corporation of Fredericksburg,” and the authority “to place upon said road machines and other vehicles necessary for the purposes of transportation, ’ ’ do not constitute a contract by which the said company may for Lall time run their engines upon
Broad street within the corporation of Richmond, and which perpetually *prohibits legislative interference and control. Nor upon the most liberal rules of interpretation can it be said that the charter has conferred such extraordinary and unlimited powers upon this corporation, either “by express grant in terms or by necessary implication.” Certainly there is no such express grant in the charter of incorporation. It cannot be implied from the fact that one of its terminal points was to be within the corporate limits of Richmond-The power to lay its track and move its cars through one of the streets of the city does not necessarily imply the power to move them by steam, nor does the authority to use steam engines on their road necessarily imply a perpetual grant for all time to run steam engines through the most populous streets of the city.
To give to. the charter such an interpretation, would be to hold not only that the legislature had deliberately violated the chartered rig'hts of the principal and capital city of the commonwealth by depriving it of the power to protect the public safety and promote the public welfare, but that the legislature had tied its own hands, and placed this corporation above and beyond the reach of the law. Before we can reach such a. conclusion, we must see in the charter itself either an express grant in terms, or one which arises from the most patent and necessary implication. Seeing neither, I am forced to the conclusion that it was competent for the legislature to confer upon the city council the power “to regulate the rate of speed of locomotives, engines and cars upon the railroads within the city of Richmond, and to wholly exclude said engines if they please;” and that the ordinance passed in conformity with this act is valid.
Nor do I perceive that this ordinance is unreasonable and oppressive, and for that reason, as was argued by *the learned counsel for the plaintiff in error, ought to be set aside.
This company was chartered more than fifty years ago. At that time much of what is now known as Broad street was a mere turnpike, neither graded nor paved, with, scattered here and there, houses on each side. It is now one of the most attractive and populous streets in the city. It being the most level and the widest street, and one most convenient to that part which contains the largest number of private residences, Broad street has now become the principal street, for the shop and retail business of this growing city. There is not only on this street a large and constantly growing resident population, but crowds are attracted to it, every day, and all hours of the day, from all parts of the city, especially ladies and children, from the fact that this street has now become the great mart for supplying the wants of families, in the varied and multiform retail business, necessary to meet the wants of a populous and growing city.
It is not therefore “unreasonable” that the city council, should, under this change *45 of circumstances, prohibit the use of steam engines on this street.
The voluminous evidence taken in this case not only shows, that these locomotives had the effect to injure the business and general prosperity of this principal street, and consequently of the whole city; but it is also proved that notwithstanding the great care and watchfulness with which this railroad has been managed, the use of steam power has been the occasion of many fearful accidents.
And under the general police power inherent in every municipal corporation (independent of the special powers conferred by the legislature “to regulate the rates of speed” of these engines “or to remove *them if they please”) the city council might well exercise this authority. The general police power existing in the legislature, is transferred to every municipal corporation to be exercised by it, for the protection of the safety and general welfare of the citizens of such corporation, and in the exercise of such authority the municipal legislature •(the city council) must of necessity be invested with a large discretion. Ogden v. Saunders, 12 Wheat. R. 213; Fisher v. Harrisburg, 2 Grant’s (Pa.) cases 291; St. Louis v. Weber, 44 Mo. R. 547; Commonwealth v. Robertson, 5 Cush. R. 431. As was said by Mr. Justice Barbour, in City of New York v. Miles, 11 Peters R. 102, 139, in speaking of the general police power of a State—“By virtue of this it is not only the right but the bounden and solemn duty of a state to advance the safety, happiness and prosperity of its people and provide for its general welfare by any and every act of legislation which it may deem to be conducive to these ends, where the power over the particular subject or the manner of its exercise is not surrendered or restrained. ’ ’ All those powers which relate to merely municipal legislation, or what may perhaps, more properly be called internal police, are not thus surrendered or restrained; and consequently in relation to these the authority of the state is complete unqualified and exclusive.
This police power, says Chief Justice Redfield, in Thope v. R. & B. R. Co., 27 Verm. R. 140, 149, “extends to the protection of the lives, limbs, health, comfort and quiet of all persons and the protection of all property within the state. It must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. ’ ’ The same eminent judge and author says in his valuable *work on the Haw of Railways: “There are confessedly certain essential franchises of such corporations (railroad companies) which are not subject to legislative control; and at the same time it cannot be doubted that these artificial beings or persons, the creations of the law, are equally subject to legislative control and in the same particulars precisely as natural persons. Railroads —so far as the regulations of their own police affecting the public safety, both as to life and property, and also the general police power of the state as to their unreasonable disturbance of, and interference with, other rights, either by noise of their engines in places of public concourse, as in the streets of a city, or damage to property, either in public streets or highways—there can be no question whatever, are subject to the right of legislative control.” 2 Redf. on Rail. | 232. And again, referring to the case of Buffalo & Niagara Falls Railroad v. City of Buffalo, 5 Hill (N. Y.) 209, the author says: “It has been held that a statute giving power to a common council of a city to regulate the running of cars within the corporate limits, authorizes the adoption of an ordinance entirely prohibiting the propelling of cars by steam through any part of the city. We should entertain no doubt of the right of the municipal authorities of a city or large town to adopt such an ordinance without any special legislative sanction, by virtue of the general supervision which they have over the police of their respective jurisdictions. Such must have been the opinion of the court in the case last referred to. Nelson, C. J., says: ‘ ‘A train of cars impelled by the force of steam through a populous city may expose the inhabitants and all who resort thither for business or pleasure, to unreasonable perils; so much so that unless conducted with more than human ^watchfulness the running of the cars (in that mode) may well be regarded as a public nuisance.” Ib. \ 250, p. 646.
In “Pierce on American Railroad Haw” the doctrine on this subject is thus succinctly and clearly laid down under the head of “Police Haws:” “A railroad company, although no power is reserved to amend or repeal its charter, is nevertheless subject, like individuals, to such police laws as the legislature may from time to time enact for the protection and safety of citizens, and the general convenience and good order. These laws although imposing liabilities and duties on the company other than those contained in its charter or existing when it was granted, do not impair the obligations of the contract implied therein.
Its property and essential franchises are indeed protected by the constitution, but the company itself is not thereby placed above the laws. It seems not to have been the design of that instrument to disarm the states of the power to pass laws to protect the lives, limbs, health and morals of citizens, and to regulate their conduct toward each other. Such laws may incidentally impair the value of franchises or of rights held under contracts, but they are passed diverso intuitu and are not within the constitutional inhibition. ’ ’
Without multiplying- authorities on this point I will simply refer to the following cases. Vanderbilt v. Adams, 7 Cowen R. 349; Coates v. Mayor N. Y. Id. 585; Baker v. Boston, 12 Pick. R. 184; 10 Barb. R. 245; 45 Maine R. 560; 5 Hill R. 209.
But it is insisted by the learned and able *46 counsel for the appellants, that the ordinance of the city council complained of, takes from the company one of its essential franchises, and seriously affects their rights of *property without compensation, and is therefore void and invalid.
It has already been shown that upon a fair construction of the charter of the Richmond, Fredericksburg & Potomac Railroad Company, there was no contract either express or implied, by which the state bound itself for all time and under all circumstances, to permit this company to run its locomotives through the streets of the city; and that the ordinance violated no contract rights of the company.
Does it violate any essential franchise? and, does it appropriate any property of the company? Clearly not. The ordinance does not prevent the company from making its connections with the depot on Broad street, but only regulates the mode by which these connections are to be made. It only declares that these connections shall not be made by steam. It only says to the company that the public safety and the general welfare of the city, in the opinion of the city council, (who are competent to judge of this matter, as the municipal legislature), requires now that the locomotives shall no longer traverse this most important street, because it exposes the inhabitants to unreasonable and constant perils and seriously affects the prosperity of the whole city. In doing this the city council are acting within their legitimate powers. They have violated no chartered rights; they have interfered with no essential franchise; nor can the railroad company claim any compensation; for in so doing the city council have not appropriated for the public use one dollar of the property of the company. It may be the company may in a certain sense, and to some extent be the loser by this ordinance; but upon well established principles they have no claim to compensation, ^because there is here no appropriation of the company’s property, or violation of its essential franchises, but only a regulation of the mode in which their chartered rights and-franchises may be exercised; and the company, like natural persons, must be subject always (unless protected by chartered rights or constitutional inhibition), to the salutary and all-pervading maxim of the law sic utere tuo ut alienum non laedas. The law is well established, by indisputable authority, and the universal assent of an enlightened jurisprudence, that every person (artificial as well as natural) holds his property subject to the limitation expressed by this maxim, exercised either by the legislature directly, or by public corporations to which the legislature may delegate it. Daws and ordinances relating to the safety, comfort, health, convenience, good order and general welfare of the inhabitants are comprehensively styled “Police Daws and Regulations.” And it is well settled, that laws and regulations of this character though they may disturb the enjoyment of individual rights are hot unconstitutional, though no provision is made for compensation for such disturbances. They do not appropriate private property for public use, but simply regulate its use and enjoyment by the owner. If he suffers injury it is. either damnum absque injuria or in the theory of the law he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to-secure. The citizen owns his property absolutely it is true; it cannot be taken from him for any private use whatever, without his consent, nor for any public use without compensation; still he owns it subject to this restriction; namely, that it must be soused as not to injure others, and that the sovereign authority may by police regulations, *so direct the use of it, that it shall not prove pernicious to his neighbors or to the citizens generally.
These regulations rest on another maxim salus populi suprema est lex. This power to restrain a private injurious use of property is very different from the eminent domain. Under the latter, compensation must always be made. But under the former, it is not a taking of private property for public use, but a salutary restraint of a noxious use by the owner contrary to the maxim sic utere tuo ut alienum non laedas.” Seé Dillon on Corporations, p. 209, 210; and cases there cited.
In Commonwealth v. Alger, 7 Cush. R. 53, Chief Justice Shaw, in an able and exhaustive opinion, in which the police power as contradistinguished from the right of eminent domain, is discussed and is peculiarly applicable to this case, says: “We think it is a settled principle, growing out of the nature of well ordered civil society, that every holder of property however absolute and itnqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. * * * Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment, as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the constitution, may think necessary and expedient. This is very different from the right of eminent domain, the right of a government to take and appropriate private *property to public use, whenever the public exigency requires it, which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the legislature by the constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth and of the subjects of the same.”
*47 There are many cases in which such a power is exercised by all well ordered governments , and where its fitness is so obvious as to be recognized by all as reasonable and proper. Such are the laws to prohibit the use of warehouses for the storage of gunpowder near habitations or highways, to restrain the height to which wooden buildings may be erected in populous neighborhoods, and require them to be covered with slate or with incombustible material; to prohibit buildings being used for hospitals for contagious diseases, or for the carrying on noxious or offensive trades; to prohibit the raising of a dam, and causing stagnant water to spread over meadows near inhabited villages, thereby raising noxious exhalations injurious to health and dangerous to life. And so, upon precisely the same principle a railroad company may be prohibited from running their cars propelled by steam through the crowded streets of a populous city, thereby subjecting property to serious injury and human life to constant and unreasonable perils.
Nor does the prohibition of the noxious use of property, although it may diminish the profits of the owner, make it an appropriation to a public use, so as *to entitle the owner to compensation. If the owner of a warehouses in the midst of a city could store in it quantities of gunpowder he might save the expense of transportation and storage at a distant point. If a landlord could let his building for a smallpox hospital, or a slaughter-house he might obtain an increased rent. If a railroad company is permitted to run their cars through the streets of a city propelled by steam, it might be less expensive and more convenient than if the same were drawn by horses. But all these are restrained, not because the public have occasion to make the like use, or make any use of the property, or to take any benefit or profit to themselves for it, but because it would be a noxious use contrary to the maxim sic utere tuo ut alienum non laedas.
It is not an appropriation of the property to a public use but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain. This distinction is manifest in principle and is recognized by unquestioned authority. Commonwealth v. Alger, 7 Cush. R. 53; Commonwealth v. Teuksbery, 11 Metc. R. 55; Baker v. Boston, 12 Pick. R. 184; Wadleigh v. Gillman, 12 Maine R. 403; Vanderbilt v. Adams, 7 Cow. R. 349; Coates v. Mayor &c., New York, 7 Cow. R. 585; 1 Dillon on Corporations § 93, pp. 209-210; 2 lb. § 565, and cases there cited.
I am of opinion for the reasons given, that the ordinance complained of is within the scope and power of municipal authority —that this power has not been unreasonably or oppressively exercised—that the ordinance merely preventing the use of locomotives on the streets does not impair the obligation of any contract, nor violate the chartered rights or any essential *franchise of the railroad company and that it is therefore valid and of full force and effect.
The judgment of the Circuit court should be affirmed.
Anderson and Bouldin, Js., concurred in the opinion of Christian, J.
Staples, J., dissented.
Judgment affirmed.