# Richmond.

## ROANOKE GAS COMPANY v. CITY OF ROANOKE.

### February 20th, 1892.

1. MUNICIPAL CORPORATIONS.—*Powers—Alienation.*—The power to grade and improve its streets granted to city by its charter cannot be delegated or alienated.

2. IDEM.—*Gas Company—Privilege to lay pipes—Removal.*—Where for value received city allowed a company to lay gas or water-pipes in its streets, the company is held to have accepted the privilege subject to the city's right to change the grade of its streets, and with the probability that the right would be exercised. The city may afterwards lower the grade, and if in so doing the pipes become exposed and obstructive, it may require the company to remove them or have it done by its own agents.

3. IDEM.—*Remedy, if any—Quære.*—If the company have any remedy for such removal of the pipes, it is at law for compensation. Is not the injury to the company *damnum absque injuria ?*

4. IDEM.—*Judiciary—Injunction.*—The municipal council, and not the court, is the judge of the expediency and necessity of exercising the power; and an injunction will not lie to prevent its exercise.

5. CHANCERY PRACTICE.—*The bill—The petition—Variance.*—The bill, in the case here, contains no allegation that the city had taken for its own uses the property of the gas company without compensation. The petition for the appeal does. But a party cannot make one case by his bill for the court below and another by his petition, for the appellate court.

6. CONSTITUTION.—*Construed.*—Article V., amendments to U. S. Constitution, providing that "private property shall not be taken for public use without just compensation," applies only to cases of *actual taking and appropriation* of private property to public uses, and not to cases where the use and enjoyment of private property by its owner are simply so regulated in accordance with the maxim, *salus populi suprema est lex,* that he must so use it as not to injure others. *Railroad Co. v. City of Richmond,* 26 Gratt. 83.

Appeal from decree of corporation court of city of Roanoke, rendered November 12th, 1888, in a cause wherein the Roanoke Gas Company (the appellant here) was complainant, and the city of Roanoke was defendant. The appellant, a corporation chartered under the laws of this commonwealth, for a valuable consideration, acquired from said city the privilege to use its streets for the purpose of laying gas-pipes, and, at its own expense, built its gas-works, laid its pipes and entered into contracts with third parties to furnish them gas for domestic and other purposes, and, among others, laid its pipes in Campbell street of said city. Afterwards the city determined to lower the grade of said Campbell street between Roanoke and Commerce streets, for the distance of fifty feet. Before the gas-pipes were laid in this street the grade thereof had been established, and the pipes were laid under the instructions of the city engineer. By lowering the grade of said street the said pipes were exposed for a distance of fifty feet, and were, in some instances, removed by the city authorities. This subjected the appellant company to great expense and inconvenience, making it necessary to take up and relay a large portion of the pipes. This action of the city authorities, subjecting the appellant to such expense and disturbing its property, was taken without notice to it; but after it was done notice was given that the pipes should be removed or lowered at its expense. Thereupon the appellant presented its bill to the judge of said court, setting forth substantially the facts as above, but more in detail, and praying for an injunction restraining said city from further interference with said pipes, and that whenever it became necessary to lower the grade of said streets the city should be required to lower the said pipes at its own expense, in order that the appellant might enjoy the franchises to which it was entitled under its contract with the city.

An injunction was awarded according to the prayer of the bill. The city, by its counsel, appealed, demurred to the bill,

and moved to dissolve the injunction. The demurrer was sustained, the injunction dissolved and the bill dismissed at the plaintiff's costs. On the application of the plaintiff an appeal was allowed by one of the judges of this court, and the decree complained of is here for review.

*Griffin & Watts*, for appellant.

*Penn & Cocke, Roy B. Smith*, and *T. W. Miller*, for appellee.

RICHARDSON, J., delivered the opinion of the court.

The one practical and far-reaching question to be solved in this case is whether there is any power in the courts to interfere with or restrain a municipal corporation from exercising, in a proper way, the powers legitimately conferred upon it by its charter or by law. In that work of superior merit, the Amer. and Eng. Encyc. of Law, Vol. XV, pp. 1012, 1043, it is said: "The general legislative power residing in the state government may delegate to a municipal corporation some portion of its own powers which are held in subordination to the general power. But these delegated powers, given for local objects, are regarded as trusts confided to the hands in which they are placed, and are not subject to be delegated by the repositories of them. The rule is plain, then, that the legislative powers of a municipal corporation cannot be vicariously exercised." * * * * "Closely related to the foregoing rule is the principle that a municipal corporation cannot divest itself of the legislative discretion conferred upon it by law. It cannot surrender it by contract nor bind itself not to exercise it whenever it may become necessary. It is important that this principle be strictly observed in order to prevent legislative powers essential to the protection of populous communities from being 'frittered away into perfect insignificance.'" An then, on page 1046, it is said: "The discre-

tion of municipal corporations within the sphere of their powers is as wide as that possessed by the government of a state. This discretion is to be exercised according to the judgment of the corporation as to the necessity or expediency of any given measure. The general assembly is a co-ordinate branch of the state government, and so is the law-making power of municipal corporation within the prescribed limits. It is no more competent for the judiciary to interfere with the legislative acts of the one than the other. Where, therefore, municipal corporations or their officers are acting within well-recognized powers, or exercising discretionary power, the courts are wholly unwarranted in interfering, unless fraud is shown or the power or discretion is being manifestly abused, to the oppression of the citizen "—citing numerous authorities.

In the leading case of *Goszler* v. *Georgetown*, 6 Wheat. (U. S.) 593, Chief-Justice Marshall said: " A corporation can make such contracts only as are allowed by the acts of incorporation. The power of this body to make a contract which should so operate as to bind its legislative capacities forever thereafter, and disable it from enacting a by-law, which the legislature enables it to enact, may well be questioned. We rather think that the corporation cannot abridge its own legislative power."

Not only has the judiciary no power to interfere to prevent a municipal corporation from exercising its legitimate functions, but such corporation itself cannot surrender or contract away its right to exercise the powers delegated to it. In 1 Dillon Mun. Corp. § 97, it is said: " Powers are conferred upon municipal corporations for public purposes; and as their legislative powers cannot, as we have just seen, be delegated, so *they cannot without legislative authority, express or implied, be bargained or bartered away.* Such corporations may make authorized contracts, but they have no power, as a party, to make contracts or pass by-laws which shall cede away, control or embarrass their legislative or governmental powers, or which shall disable them from performing their public duties. The cases

cited mark the scope and illustrate the application of this salutory principle in a great variety of circumstances, and, for the
protection of the citizen, it is of the first importance that it
shall be maintained by the courts in the full extent and vigor."

" As the highways of a state, including streets in cities, are
under the paramount and primary control of the legislature,
and as all municipal powers are derived from the legislature, it
follows that the authority of municipalities over streets, and
the uses to which they may be put, depends entirely upon their
charters or the legislative enactments applicable to them.    It
is usual in this country for the legislature to confer upon municipal corporations very extensive powers in respect to streets
and public ways within their limits, and the uses to which they
may be appropriated.   *   *   *   *   *   The authority to open,
care for, regulate and improve streets, taken in connection
with the other powers usually granted, gives to municipal corporations all needed authority to keep the streets free from
obstructions, and to prevent improper use, and to pass ordinances to this end."   2 Dillon Mun. Corp. § 680.   And in section
685, the same learned author, after stating the proposition that
the " Power to improve and graduate is continuing and inalienable," says:   " That the use of the streets for travel may be
made safe and convenient, the legislature usually confers upon
the municipal authorities the power, in express terms to *graduate and improve* them, and supplies the means to carry the
power into effect by requiring the inhabitants to perform labor
upon the streets, or to pay specific taxes for that purpose, or
taxes that may be appropriated by the corporation."   *   *   *
And the author cites the case of *Goszler* v. *Georgetown, supra,*
where Chief-Justice Marshall said:   " That the power to graduate given by the legislature was not exhausted by its first exercise, but was a continuing one; the power is given to the town
to legislate on the subject, to pass as many by-laws relating
thereto as the corporation may judge necessary for the benefit of
the town."   And in section 686, the same author says:   " That the

power *to grade and improve streets*, like other legislative powers, is a *continuing one*, unless the contrary be indicated, has been frequently decided in both the Federal and State courts. It may, therefore, be exercised from time to time, as the wants of the public may require. Of the necessity or expediency of its exercise, the governing body of the corporation, and not the courts, is the judge. And the law is also settled that, unless expressly so declared by special constitutional provision, or by charter or statute, a municipal corporation is not liable to property owners for the consequential damages necessarily resulting from either establishing a grade or changing an established grade of streets, although improvements were made in conformity with the first grade."

The power to lay out, grade and improve its streets is by its charter expressly conferred upon the city council. The charter act is found in Acts 1881–'2, p. 52, ch. 57, entitled an act to amend and re-enact an act entitled an act to incorporate the town of Big Lick, approved February 28th, 1874, and all acts amendatory thereof, approved February 3d, 1882. By the first section of this act it was declared :

§ 1. "The town of Big Lick, in the county of Roanoke, chartered by an act of assembly passed February twenty-eight, eighteen hundred and seventy-four, shall hereafter be called and known as the town of Roanoke, and by that name shall have and exercise all the powers, and be subject to all the duties, which now belong to the said town, and be subject to all the provisions of the existing law with regard to towns, except so far as may herein be otherwise provided."

After, by the third section, having provided that " the municipal officers of said town shall consist of a mayor and six councilmen, who shall, together, constitute the council of said town, &c.," by the sixth section it is provided as follows :

§ 6. The council shall have power to close or extend, widen or narrow, lay out and graduate, pave, and otherwise improve streets and public alleys in the town, and for these purposes,

upon first paying a just compensation therefor, it may take such private property as may be necessary, and no order shall be made and no injunction shall be awarded by any court or judge to stay the proceedings of the town in the prosecution of such works, unless it be manifest that the interposition of a court is necessary to prevent injury that cannot be compensated in damages," &c.

On the 31st of January, 1884, an act was approved entitled " An act to provide a new charter for the City of Roanoke." See Acts 1883–'84, p. 87.

By the 18th section of this new charter it is provided, among other things, that the city council shall have power " to establish or enlarge water-works and gas-works within or without the limits of the city; to contract and agree with the owners of any land for the use and purchase thereof, or have the same condemned according to law, for the location, extension or enlargement of their said works, the pipes connected therewith, or any of the fixtures or appurtenances thereof, and shall have the power to protect from injury by ordinance prescribing adequate penalties, the said works, pipes, fixtures, and land, or anything connected therewith, whether within or without the limits of said city." And " to close or extend, widen or narrow, lay out, graduate, curb, and pave, and otherwise improve streets, sidewalks, and public alleys in said city, and have them kept in good order, and properly lighted; and over any street or alley in the city which has been or may be ceded or conveyed to the city by proper deed, they shall have like power and authority as over other streets and alleys; they may build bridges in and culverts under said streets, and may permit shade-trees to be planted along said streets; but no company shall occupy with its works, or any appurtenances thereof, the streets, sidewalks, or alleys of the city without the consent of the council, duly entered upon its record. In the meantime, no order shall be made, and no injunction shall be awarded by any court or judge to stay the proceedings of the city in the

prosecution of their works, unless it be manifest that they, their officers, agents, or servants are transcending the authority given them by this act, and that the interposition of the court is necessary to prevent injury that cannot be adequately compensated in damages."

Thus, in express terms, the legislature conferred upon the corporate authorities of the city of Roanoke the most ample powers to grade and otherwise improve its streets, from time to time, as in its judgment and discretion, was required for the safety and convenience of the public. The powers thus delegated are continuing and inalienable. It is, therefore, undeniable that though a city may have agreed for a valuable consideration to allow a company to lay gas or water-pipes in its streets, yet, if in the exercise of its authority to lower the grade of and to remove obstructions from its streets, the pipes should become exposed so as to obstruct the public in the safe and convenient passage along them, the municipal authorities may of right either require such company to remove, or they, by their servants may remove them as obstructions and nuisances.

This doctrine is well illustrated by the case of *Louisville City Ry. Co.* v. *Louisville*, 8th Bush. 415 (2 Dil. Mun. Corp., p. 820, note), in which the contract for the right of way, &c., between the city and the Louisville City Railway Company, provided that the city shall not be liable for any damages " from any delay in the transportation of passengers that may be increased by the laying of sewers, water or gas-pipes," &c. The company refused to take up its track to enable the city to construct a sewer; and, thereupon, the city caused the track to be taken up, and refused to replace it. For thus taking up and refusing to replace the track it was held that the city did not become liable for damages to the railway company; that the city did not and could not surrender its right to construct sewers in such portions of its limits as might require them, and that the railway company held its right of way subject to this power.

In a note on page 825 of the same volume, the author says: "A gas company empowered to lay its pipes in the streets of a city takes the risk of their location, and may be required to make such changes as public convenience or security requires, at its own expense"—citing Matter of Dearing, 93 N. Y. 361.

Applying these principles, it is obvious that the case presented by the appellant, the Roanoke Gas Company is without merit. The bill avers that the appellant was notified by the city engineer that the said pipes that had become exposed by the lowering of the grade of Campbell street were an obstruction to public travel, and that they must be lowered or removed for the distance of about fifty feet. We fail to perceive how, in these proceedings, the city transcended its powers in respect to grading and improving its streets, or how by such proceedings an injury could be inflicted upon the appellant that could not be adequately compensated in damages.

By a well-established rule of pleading the demurrer admits the truth of all facts alleged in the bill that are well pleaded. But by another rule, equally well established, a party can only have a decree on the case made by his bill. *Munday* v. *Vawter*, 3 Gratt. 495; *Rorer I. Co.* v. *Trout*, 83 Va. 415; *S. V. R. R. Co.* v. *Dunlop*, 86 Va. 353.

The bill in the present case sets out, with elaboration, the contract made by the appellant with the city of Roanoke, whereby it acquired, for a valuable consideration, the privilege of laying its gas-pipes in the streets of that city, and, with equal elaboration, alleges breaches of said contract and injuries to its property by the city, and claims equitable interposition to prevent injury that could not be adequately compensated in damages. We fail to perceive, as has already been said, how and why the alleged injuries could not be adequately compensated at law, if, indeed, the acts complained of be not *damnum absque injuria*, as would seem to be the case, inasmuch as the appellant company accepted the privileges accorded it by said contract with full knowledge not only that the city

retained the power to change the grade of its streets, as in its judgment and discretion the public welfare might require, but also of the probability of such change in a new city, such as Roanoke. And the company must be held to have accepted its said privileges subject to the right of the city to change the grade of its streets, and with the probabilities that the right would be exercised.

But the bill contains no allegation or complaint that the city had taken for its uses the property of the gas company without just compensation, in violation of the constitutional safeguard of property.

It is true that in the petition for appeal it is substantially alleged that " the franchise acquired by the company by virtue of said contract is property, and that the acts of the city so impair and injure said property as virtually to confiscate it, and that if it be necessary that it be injured for the public good then it should be condemned as other property, under the law of eminent domain." But, we repeat, no such allegation or complaint is made in the bill, and it is the case made by the bill that the court must base its action; for no one would be bold enough to claim that a party can make one case by his bill for the court below and another and different one by his petition for the appellate court, as seems to have been attempted in this instance.

But whether or not this be the true interpretation of the appellant's bill, it is yet true that the laws of this state providing for the condemnation of private property for public uses apply only to cases where such property is actually taken, and in such cases alone is there provision made for compensation to the owner. These provisions have no application to cases where property is only injured or impaired in value, but only to cases where the property is actually taken. The very language of the constitutional inhibition being " nor shall private property be *taken* for public use without just compensation." Article V, Amendments Constitution United States. See, also, Code, 1887, chapter 46

That the constitutional provision in question applies only to cases of actual taking and appropriation of private property to public uses is a proposition that cannot now be questioned in this state.    It was expressly so held by this court in the case of *Richmond, Fredericksburg and Potomac R. R. Co.* v. *City of Richmond,* 26 Gratt. 83, a case very similar to the case at bar.    That case came up upon a writ of error to a judgment of the circuit court of the city of Richmond, affirming a judgment of the police justice of said city, imposing a fine upon said railroad company for running its cars, propelled *by* steam, upon Broad street, east of Belvidere street, in violation of a city ordinance passed September 8th, 1873, entitled an ordinance to amend the third section of an ordinance to regulate the use of Broad street by the Richmond, Fredericksburg and Potomac Railroad Company.

Said third section, as amended and reordained, is as follows:

§ 3.  " That on and after the 1st day of January, 1874, no car, engine, carriage, or other vehicle of any kind, belonging to or used by the Richmond, Fredericksburg and Potomac Railroad Company, shall be drawn or propelled *by steam* upon that part of their railroad or railway track on Broad street, east of Belvidere street, in said city.    The penalty for failing to comply with this section shall be not less than one hundred nor more than five hundred dollars for each and every offence, to be recovered before the police justice of the city of Richmond."

The said railroad company admitted the violation of this ordinance, but claimed that the ordinance was *invalid, because* it was in violation of its chartered rights.    And in support of this contention the company relied upon two provisions in its charter—to-wit : First.  That it was authorized by its charter to construct a railroad *from some point within the corporation of Richmond, to be approved by the common council,* to some point within the corporation of Fredericksburg, &c.    Second.  The company relied upon the provision contained in the 24th section of its charter, that, " The president and directors, or a majority of

them, shall have power to purchase with the funds of said company, and place on the railroad constructed by them under this act all *machines*, wagons, vehicles, carriages, and teams of any description whatever, which they may deem necessary and proper for the purpose of transportation."

On the other hand, the city of Richmond claimed that it had the right, not only under the general police power vested in it as a municipal corporation, antedating and overriding the charter of the railroad company, but under authority conferred upon the city council, by act of the legislature amending the city charter, to exercise complete and absolute authority to regulate the use of Broad street by said company.

The amended charter of the city of Richmond, above referred to, and relied upon by said city, is found in an act of the legislature approved May 24th, 1870, vesting in the council of said city the power " to prevent the cumbering of streets, avenues, walks, public squares, lanes, alleys, or bridges in any manner whatsoever," and the power " to determine and designate the route and grade of any railroad to be laid in said city, and to restrain and regulate the rate of speed of locomotives, engines, and cars upon the railroads within said city, and may wholly exclude said engines or cars if they please; provided, no contract may be thereby violated."

It was under the authority of this amended charter that the ordinance was passed prohibiting said railroad company, on and after January 1st, 1874, from propelling its engines, cars, &c. by steam on Broad street, east of Belvidere street.

The Richmond, Fredericksburg and Potomac Railroad Company had been chartered by an act of the legislature of the state, passed February 24th, 1834. As already stated, the company was authorized to construct a railroad from some point within the corporate limits of Richmond, " *to be approved by the common council.*" On the 22nd of December, 1834, at a meeting of the president and directors of said company, the following preamble and resolutions were adopted:

" Whereas, by the act incorporating this company *it is requisite* that the point at which the railroad terminates, within the corporation of Richmond, should be approved by the common council, and it appears to the board most expedient to conduct the same from the Richmond turnpike along H street (now Broad street) to a point at or near the intersection of the said street and eighth street, *and for the present* to terminate the same by suitable connections with the contemplated warehouses and workshops of the company on lots Nos. 477, 478, purchased by them from John Heth ; therefore,

" Be it resolved, That the approbation of the city council be requested to the above plan.

" Resolved, That the president cause a copy of the foregoing resolutions to be transmitted to the city council," &c.

It will be observed that in these proceedings the railroad company recognized the fact, that as to fixing the Richmond terminus of the railroad, the approval of the common council of the city was requisite, and that it selected and suggested a point *for the present*, and not as the permanent Richmond terminus, and solicited the approval of its plan and suggestion by the city council.

In response to this action on the part of the president and directors of the railroad company, the city responded as follows :

" Resolved, That the common council do approve the proposed location of the said railroad, and the *present* termination of the same as described in the foregoing resolution, and authorize the prosecution of the said work within the limits of the city on the above locations ; provided, that in locating said railroad no injury shall be done to the water-pipes now laid in and along said street; provided further, that the corporation of Richmond *shall not be considered as hereby parting with any power or chartered privilege not necessary* to the said railroad company for constructing said railroad, and connecting the same with the depot of said company within the limits of the city."

The proceedings of the city council, and the two sections of the act of incorporation above referred to, were made the basis of the claim on the part of the railroad company, of a perpetual and irrepealable *contract* between the state and that company, by which it, for all time and under all circumstances, was entitled to run its cars propelled by steam through one of the most populous and important streets of the city of Richmond. The case turned upon the validity of the ordinance aforesaid of the common council prohibiting said railroad company from propelling its engines and cars by steam over that part of its tract along Broad street, east of Belvidere street, in said city. This court held: First. That "the charter of the Richmond Fredericksburg and Potomac Railroad Company does not in express terms, or by necessary implication, vest in the company the right to propel her engines by steam through the streets of a city without the consent of the corporate authorities of the city, and the charter of the city of Richmond, giving to the council of the city the authority to prevent the propelling of the cars of a railroad company by steam through the streets of the city, provided no contract is thereby violated, the council may prohibit said railroad company from the use of steam in propelling their cars in the streets of the city. Second. That "a corporation, except where it is otherwise provided in its charter, expressly or by clear implication, in the use of its property, the exercise of its powers and the transaction of its business, stands upon the same footing as individuals, and is subject to the same control under the police powers of the state or a municipal corporation."

In delivering the opinion of the court, Christian, J., said: "It is conceded that a charter granted to a corporation by the state may be, according to its terms, a *contract* between the state and the corporation, the obligation of which cannot be impaired by subsequent legislation; but at the same time, while this is conceded, it is also certainly true that corporations, like natural persons, are subject to remedial legislation,

and amenable to general laws.  Private corporations, even
without any express reservation of the powers over them by
the legislature in their charters, are subject like individuals to
be restrained, limited and controlled in the exercise of their
powers by such laws as the legislature may pass, based upon
the principles of safety to the public.  It is well settled, and
cannot now be disputed, that the legislature may control the
actions, prescribe the functions and duties of corporations, and
impose restraints upon them to the same extent as upon natu-
ral persons, subject, of course, to the limitation of not impair-
ing the obligation of contracts made between the corporation
and the state.  See Redfield on Railways, and note and cases
there cited."  The learned judge, in support of this view, then
proceeds to say : " A corporation is," in the language of Chief-
Justice Marshall, in *Dartmouth College* v. *Woodward*, 4th Wheat.
R. 518, " the mere creature of the law; it possesses only those
properties which the charter of its creation confers upon it,
either *expressly or as incidental to its very existence.*"  And it was
expressed by the same great judge in *Providence Bank* v. *Bill-
ings*, 4th Peters' R. 514 : " Any privileges which may exempt
a corporation from the burdens common to individuals do not
flow necessarily from the charter, but must be *expressed in it,
or they do not exist.*"

A cardinal rule, in the interpretation of charters of incor-
poration, is thus laid down by Mr. Justice Grier in *Richmond
Railway Co.* v. *The Louisa Railway Co.*, 13 How. U. S. R. 71 :
" Public grants are to be construed strictly, and any ambiguity
in the terms of the grant must operate against the corporation
and in favor of the public ; and the corporation can claim
nothing but what *is clearly* given by the act."

In *Charles River Bridge* v. *Warren Bridge*, 11 Peters' R. 420,
448, Chief-Justice Taney, enforcing the same rule, said : " The
continued existence of a government would be of no great
value if by implication and presumptions it was disarmed of
the powers necessary to accomplish the ends of its creation,

and the functions it was designed to perform transferred to privileged corporations."

Judge Christian then proceded to say : " Applying these rules of law and canons of construction to the charter of the Richmond, Fredericksburg and Potomac Railroad Company, it is clear that there is nothing in the privileges and franchises conferred by that charter which prevents the legislature, either of itself or through a municipal corporation to which it has delegated its authority, from prescribing rules and regulations for the exercise of those privileges and franchises. And it is equally clear that the authority granted in the charter of incorporation to construct a road ' from a point within the corporation of Richmond, to be approved by the city council, to a point within the corporation of Fredericksburg,' and the authority to ' place upon said road *machines* and other vehicles necessary for the purposes of transportation' do not constitute a *contract* by which the said company may for all time run their engines upon Broad street within the corporation of Richmond, and which perpetually prohibits legislative interference and control. Nor upon the most liberal rules of interpretation can it be said that the charter has conferred such extraordinary and unlimited powers upon this corporation, either ' by express grant in terms or by necessary implication.' Certainly there is no such *express grant* in the charter of incorporation. It cannot be implied from the fact that one of its terminal points was to be within the corporate limits of Richmond. The power to lay its track and move its cars through one of the streets of the city does not *necessarily* imply the power to move them *by steam*, nor does the authority to use steam-engines *on their road* necessarily imply a perpetual grant for all time to run steam-engines through the most populous streets of the city. To give to the charter such an interpretation would be to hold not only that the legislature had deliberately violated the chartered rights of the principal and capital city of the commonwealth, by de-

priving it of the power to protect the public safety and promote the public welfare, but that the legislature had tied its own hands, and placed this corporation above and beyond the reach of the law. Before we can reach such a conclusion we must see in the charter itself either an express grant in terms, or one which arises from the most patent and necessary implication. Seeing neither, I am forced to the conclusion that it was competent for the legislature to confer upon the city council the power 'to regulate the rate of speed of locomotives, engines and cars upon the railroads within the city of Richmond, and to wholly exclude said engines if they please;' and that the ordinance passed in conformity with this act is valid."

Having shown conclusively, upon principle and authority, that upon a fair construction of the charter of the Richmond, Fredericksburg and Potomac Railroad Company, there was *no contract*, either express or implied, by which the state bound itself for all time and under all circumstances to permit said company to run its locomotives by steam through the city, and that the ordinance violated no *contract rights* of said company, Judge Christian then proceeded to meet the objection that said ordinance of the city council took from the railroad company one of its *essential franchises*, and seriously affected its rights of property *without compensation*, and was therefore invalid, and said: " Does it violate any essential franchise? and does it *appropriate* any property of the company? Clearly, not. The ordinance does not prevent the company from making its connections with the depot on Broad street, but *only regulates the mode* by which these connections are to be made. It only declares that these connections shall not be made by steam. It only says to the company that the public safety and the general welfare of the city, in the opinion of the city council (who are competent to judge of this matter, as the municipal legislature), *requires now* that the locomotives shall no longer tra-

verse this most important street, because it exposes the inhabitants to unreasonable and constant perils and seriously affects the property of the whole city. In doing this the city council is acting within its legitimate powers. They have violated no chartered rights; they have interfered with no essential franchise; nor can the railroad company claim any compensation; for in so doing the city council have not appropriated for the public use one dollar of the property of the company. It may be the company may, in a certain sense, and to some extent, be the loser by this ordinance; but upon well-established principles they have no claim to compensation, because there is here no appropriation of the company's property, or violation of its essential franchises, but only a regulation of *the mode* in which their chartered rights and franchises may be exercised; and the company, like natural persons, must be subject always (unless protected by chartered rights or constitutional inhibition) to the salutary and all-pervading maxim of the law *sic utere tuo ut alienum non lædas.* The law is well-established, by indisputable authority, and the universal assent of an enlightened jurisprudence, that every person, artificial as well as natural, holds his property subject to the limitation expressed by this maxim—exercised either by the legislature directly, or by public corporations to which the legislature may delegate it. Laws and ordinances relating to the safety, comfort, health, convenience, good order, and general welfare of the inhabitants are comprehensively styled 'Police Laws and Regulations.' And it is well settled that laws and regulations of this character, though they may disturb the enjoyment of individual rights, are not unconstitutional, though no provision is made for compensation for such disturbances. They do not *appropriate* private property for public use, but *simply regulates* its use and enjoyment by the owner. If he suffers injury it is either *damnum absque injuria,* or in the theory of the law he is compensated for it by sharing

in the general benefits which the regulations are intended and calculated to secure.   The citizen owns his property absolutely it is true ; it cannot be taken from him for any private use whatever, without his consent, nor for any public use without compensation ; still he owns it subject to this restriction— namely, that it must be so used as not to injure others, and that the sovereign authority may by police regulations so direct the use of it that it shall not prove pernicious to his neighbors or to the citizens generally.   These regulations rest on another maxim—*salus populi suprema est lex.*   This power to restrain a private injurious use of property is very different from the eminent domain.   Under the latter, compensation must always be made ; but under the former, it is not a taking of private property for public use, but a salutary restraint of a noxious use by the owner contrary to the maxim *sic utere tuo ut alienum non lœdas.*"

We have thus not only made a very full statement of the case of *Richmond, Fredericksburg and Potomac R. R. Co.* v. *City of Richmond,* but we have drawn largely upon the opinion delivered in that case by Judge Christian.   This we have done for the reason, first, that the opinion is an elaborate and well considered one ; and, second, to show that the doctrine enforced in that case must necessarily be enforced in the present case.

The same principles were applied and enforced by this court in the late case of *Davenport & Morris* v. *Richmond City,* 81 Va. 636, in which the doctrine enforced in *Richmond, Fredericksburg and Potomac R. R. Co.* v. *City of Richmond,* was expressly approved and followed.   In that case, by deed dated February 5th, 1867, the council of the city of Richmond, for value, conveyed to parties under whom Davenport & Morris claim, with general warranty, a lot of land near the outskirts of the city, " to be used by them as a powder magazine, subject to such regulations relative to the storage, receipt, delivery and transportation of powder, as the council may prescribe, on which

magazines were erected at a large outlay of money. An ordinance of the city prohibited any person from keeping more than twenty-five pounds of powder in the city elsewhere than in a "magazine approved by the council." An ordinance passed August 17th, 1882, without the knowledge of Davenport & Morris, declared their said magazine dangerous to life and property, and directed it "to be removed *at the expense* of the owners." Upon proceedings had for the purpose, before the police justice of the city, a fine was imposed upon Davenport & Morris for violating the ordinance aforesaid forbidding the keeping of more than twenty-five pounds of powder in the city elsewhere than in a magazine approved by the council. The case was brought to this court on a writ of error to the judgment of the hustings court of the city of Richmond affirming the judgment of the police court. This court held, first, that the storage of gunpowder in a city being dangerous, its regulation is a matter within the power of the corporate authorities, and their judgment, as expressed in an ordinance requiring the removal of a powder magazine, is conclusive upon the courts; and, second, that an ordinance requiring the removal of powder magazines in a city, the sites whereof were sold by the city council to vendees for the purpose of erecting thereon such magazines, does not impair the obligation of a previous valid contract with that council, and does not take private property without compensation; but is constitutional, being a valid exercise of the public power.

In delivering the opinion of the court, Lewis, P., said: "It is contended that the ordinance complained of is unconstitutional and void—first, because it impairs vested rights of the defendants under a previous valid contract with the city council; and, second, because it takes the property of the defendant without compensation. Upon the principles recognized by this court in *Richmond, Fredericksburg and Potomac Railroad Company* v. *City of Richmond*, 26 Gratt. 83, we are of opinion

that this position is not well taken; in other words, that the withdrawal of the privilege previously granted to the defendants to erect and maintain a powder magazine within the city limits was the valid exercise of the police power, with which, to that extent, the city is invested by the legislature, and with reference to which the privilege was granted and accepted. And hence, the inconvenience of which the defendants complain is *dammum absque injuria.*"

In the present case there has been no taking, no appropriation of private property to public use; hence no question as to the exercise of the right of eminent domain arises. The simple question is as to the right of a municipal corporation to grade and improve its streets from time to time, as, in its judgment, the public exigency may require. The power to do this is embraced in the general police power delegated by the state in express terms to the council of the city of Roanoke. In the absence of any constitutional or statutory restriction, it is a power essentially incident to the existence and well being of every municipal corporation. It is a proposition. too well established, to be now questioned, that the powers thus delegated are trusts held for the public good, are continuing and cannot be contracted away, nor can the municipal authorities bind themselves by contract not to exercise them from time to time as the public good may require. Hence, notwithstanding the valid contract by which the city council of Roanoke granted to the gas company the use of the streets for laying down its pipes, said company accepted the grant of the privilege, subject to the permanent right of the city to change, alter and improve the grade of its streets whenever, in the judgment of the city council, the safety and convenience of the public requires it to be done. Of the necessity or expediency of the exercise of such power, the city council and not the courts, is the judge. It follows, therefore, that the city council of Roanoke did not transcend its power in the present case; that

the act complained of was but the legitimate exercise of the police power; that there is no power in the courts to restrain the free exercise of such power, and that the court below did not err in sustaining the demurrer to, and dismissing the appellant's bill. The decree of the court below must, therefore, be affirmed.

FAUNTLEROY, J., concurred in the result.

DECREE AFFIRMED.