# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA

### Richmond.

## CITY OF LYNCHBURG V. DON P. PETERS AND OTHERS.

January 14, 1926.

Rehearing refused, Wytheville, June 9, 1926.

1. STREETS AND HIGHWAYS—*Diversion to Private Interests.*—A city has no authority to divert public streets or any part thereof to the exclusive use of private interests.

2. STREETS AND HIGHWAYS—*Streets are Public Highways—Legislature Controlling—Delegation of Power to Municipal Corporation.*—Streets are public highways, and hence the legislature has supreme control over them, to open, improve, repair, or to vacate them; but this authority may be delegated to municipalities, and when so delegated may be exercised by the municipalities to the full extent of the power conferred.

3. STREETS AND HIGHWAYS—*Authority to Open and Close.*—The authority to open and close streets is sometimes conferred by general statute, and so essential an incident of local government is it that it has been held to have been granted in a general welfare clause in a general statute relating to cities.

4. STREETS AND HIGHWAYS—*Closing Streets—Power of the City of Lynchburg to Close Streets and to use them as a Park and Athletic Field.*—The city council of Lynchburg, acting in good faith, could legally close streets and use them as a site for an athletic field and stadium under section 3030 of the Code of 1919, authorizing municipalities to *alter* their streets and the city charter empowering the city to *close* and otherwise *alter* its streets.

5. STREETS AND HIGHWAYS—*Authority to Open and Close Conferred by Charter.*—The authority to open and close, etc., can undoubtedly be, and generally is, conferred by charter.

Syllabus.

6. MUNICIPAL CORPORATIONS—*Power of Municipality—Express Grant or Fair Implication.*—The powers of municipal corporations are limited to those granted in express terms, or fairly implied, as essential to ts declared object and purpose.

7. STREETS AND HIGHWAYS—*"Close"—"Vacate."*—There is ample authority for holding the terms "close" and "vacate," where the closure is permanent, are interchangeably used. Indeed they can have no different meaning when applied to the authority of a city over its streets.

8. INTERPRETATION AND CONSTRUCTION—*Ordinary Meaning of Words.*—The rule of construction is to give words their ordinary meaning unless a contrary meaning is clearly intended.

9. STREETS AND HIGHWAYS—*Closing—Obstructing.*—It is, of course, true, generally speaking, that streets can only be closed, in the exercise of judgment and discretion of the city council for the public welfare. They cannot be obstructed or partially or temporarily closed for the benefit of private interests.

10. STREETS AND HIGHWAYS—*Closing—Reviewed by Courts.*—When the power to vacate or close streets has been delegated to a municipality, in the absence of a showing that the closure was for solely private benefit, or that it was the result of collusion or fraud, it is the exercise of a political or legislative function which the courts will not review.

11. STREETS AND HIGHWAYS—*Closing—Streets Held in Trust for Public Services—Inconsistent Use.*—While it is true that the municipality holds the streets in trust for public purposes, and that it cannot put them to any use inconsistent with their uses as streets, yet this principle does not interfere with the municipality's authority to close them when that authority has been granted.

12. STREETS AND HIGHWAYS—*Closing—Streets Acquired by Dedication or Condemnation.*—The power to close streets may be exercised whether they were acquired by dedication or by condemnation. If the street is legally closed, the trust ends so far as maintaining it as such is concerned.

13. STREETS AND HIGHWAYS—*Fee in Street—Rights of Abbuting Owners—Abandonment or Closure of Streets.*—Ordinarily, that is, in the absence of a grant affecting the right of a lot owner abutting on a street, he owns the fee in the land occupied by the street to the center thereof for the full distance of his lot frontage; and, in case of abandonment or legal closure of a street, the unrestricted use and ownership is in the lot owner.

14. STREETS AND HIGHWAYS—*Rights of Abutting Owners.*—An abutting owner in common with the general public has a public right of way over the street, and as an abutting landowner, he has in addition certain property rights which the public generally does not possess,

among them is the right of egress or ingress from and to his lot by way of the street.

15. STREETS AND HIGHWAYS—*Closing Street—Rights of Property Owners Abutting on the Street but not on the Portion of the Street Closed.*—Abutters upon a public street, simply as abutters, have no right of travel in the street as against the State, which would entitle them to compensation if the street be closed under the authority of the State, in a case where no portion of the street in front of their abutting estates is closed. The easement of travel which they enjoy is a public easement, and they enjoy it simply as a portion of the public. It is competent for the State, representing the public, to authorize the entire discontinuance of a street, so long as the abutters have access and egress to and from their estates by other ways.

16. STREETS AND HIGHWAYS—*Closing Streets—Rights of Property Owners Abutting on the Street but Not on the Portion of the Street Closed—Case at Bar.*—The city of Lynchburg closed portions of two streets for the purpose of converting the land into an atheletic park and stadium as it had authority to do under general law and its charter. Complainants were lot owners abutting on the closed streets but not on the portions closed.

*Held:* That complainants had no private easement of way distinct from the rights of the public, and were not entitled to compensation by virtue of their location upon the streets, nor were they entitled to an injunction restraining the closing of the streets.

17. STREETS AND HIGHWAYS—*Closing Streets—Closed Portions Converted to Other Public Uses.*—Streets or portions of streets can be vacated and such streets or portions thereof diverted to other public uses where the public uses to which they are put are within the scope of the city's authority.

18. STREETS AND HIGHWAYS—*Closing Streets—Closed Portions Converted to Other Public Uses.*—The city of Lynchburg by its charter, subsection 5 of section 9, is specifically given authority to establish parks, playgrounds, stadiums, etc., and to acquire land therefor by purchase, condemnation or otherwise or to establish and build them upon city property. While under this provision the city could not use, or permit to be used, the streets of the city for private or public purposes, other than as streets, yet, once a street is lawfully closed, it is no longer a street, and the city may use the vacated area for any public purpose to which it may be legally dedicated.

19. STREETS AND HIGHWAYS—*Fee—Reverter Where Street is Closed.*—Where the city of Lynchburg owned all the land abutting on the closed portions of certain streets, if the streets were lawfully closed, the fee in the land formerly occupied by the streets is in the city and under the authority of the city charter, subsection 5 of section 9, can be used along with the surrounding territory which the city also

owns, for the establishment of a park or stadium, or for any other purpose authorized by law.

20.   NUISANCES—*Injunction—Structure that May Become a Nuisance.*—It is a well established principle of equity jurisprudence that where a proposed structure, or the use of it, is not a nuisance *per se,* a court of equity will not grant an injunction against the erection of the structure or the use, merely because it may become a nuisance. The alleged nuisance must be the necessary result or the court will await the actual results.

21.   NUISANCES—*Public Nuisance—That Which the Law Authorized.*—That cannot be a public nuisance which the law authorizes.

22.   NUISANCES—*City Parks and Playgrounds—Case at Bar.*—Code of 1919, section 3030, provides that a city shall have power to establish and maintain parks and playgrounds. By its charter (Acts 1923, ch. 51), the city of Lynchburg is authorized to establish public squares, playgrounds and parks and to maintain stadiums, swimming pools, etc.

*Held:* That in view of these provisions, the mere establishment of an athletic park, and the mere construction of a stadium thereon, could not, as a matter of law, be held a nuisance *per se.*

23.   NUISANCES—*City Parks and Playgrounds—Case at Bar.*—While the mere establishment of an athletic field and stadium by a city, could not be held a nuisance *per se,* yet they may be so conducted as to create a nuisance, and in that event the courts would have full power, upon proper proceedings, to enjoin that which is unlawful. But it cannot be assumed that the city will permit such a nuisance to be created.

24.   NUISANCES—*Playground for Children.*—It has been held that even where not established by municipal authority under a charter, a playground for children is not a nuisance *per se.*

25.   INJUNCTIONS—*Irreparable Injury—Closing of Streets and Establishment of a Park.*—In a suit to enjoin the closing of certain streets and the establishment of a park, complainants' bill did not show wherein complainants suffered any special or peculiar damage or damages to private property as distinguished from the damage sustained by the public at large. Complainants alleged irreparable injury but alleged no facts to show it.

*Held:* That the mere allegation of irreparable injury was not sufficient.

Appeal from a decree of the Corporation Court of the city of Lynchburg.   Decree for complainant.   Defendants appeal.

*Reversed and rendered.*

The opinion states the case.

*T. G. Hobbs* and *Fred Harper*, for the appellant.

*Randolph Harrison*, for the appellees.

CHICHESTER, J., delivered the opinion of the court.

This is a suit in which Don P. Peters and others, residents of the city of Lynchburg, Virginia, hereinafter referred to as complainants, seek to enjoin the city council of that city from closing Court street for a distance of 378 feet, between Washington and 12th streets, where it intersects with 13th street, and 13th street for a distance of 311 feet, where it intersects with Court street, between Church and Clay streets, and from converting the portions of the streets so closed, together with certain adjacent lots, now owned by the city, into a public park, playground and athletic field.

[A plat showing the area owned by the city, the streets mentioned above and the lots owned by the complainants, appears on the following page, and reference is made to it to make clear the situation.]

Previous to the filing of the bill for injunction the city council, at a regular meeting thereof, had adopted an ordinance closing the portions of Court and 13th streets indicated on the plat, and by resolution had directed the city manager to proceed with the grading and preparation of the park or athletic field in accordance with the plans submitted to the council, and provided for in the 1924 budget.

At the July term of the corporation court, complainants filed their bill in chancery, alleging that they were owners of property occupied by them for hospital and residence purposes, abutting on portions of Court and 13th streets, not abutting on any of the closed

portions of these streets, however, but adjoining or in
the near vicinity of the proposed park and athletic

field; that the city had already obstructed the streets,
which it had no authority in law to close; that Court

and 13th streets had been open to the public as streets for over a hundred years, and that complainants had purchased their properties adjacent thereto with reference to the plat or map duly recorded showing the streets; that they had vested rights to the use of the easement in the streets necessary to the enjoyment of their lots; that the establishment and maintenance of the park would constitute a public nuisance, and that they would be damaged thereby in a way that could not be adequately compensated for in damages. They prayed an injunction restraining the city from further prosecution of the work, and for a mandatory injunction requiring the city to restore the streets to their former condition.

The corporation court awarded a temporary injunction.

The city filed a demurrer and answer to the bill, and for grounds of demurrer alleged:

That the nuisance complained of, if any nuisance at all, was a public nuisance; and the plaintiffs' bill did not disclose any such special or peculiar damage to them as would permit them to proceed in equity for relief against it.

That the bill did not disclose any facts which would justify a court of equity in holding the acts of the city to constitute a nuisance *per se*, against which an injunction could be awarded.

The court overruled the demurrer, and the parties, by leave of court, filed an agreed statement of facts based upon the bill and answer, as follows:

"It is hereby agreed between the parties to the above styled cause, as the basis of a decision on the bill, answer and replication, that the allegations of the bill state facts that are to be considered as proved by formal testimony, but in making this admission the

defendant does not concede the following conclusions based on said facts:

"(1) That the proposed public park, playground and stadium, and the uses thereof, will constitute a nuisance *per se.*

"(2) That the property of the several plaintiffs would be injured to the extent stated in the bill.

"(3) And the defendant does not concede that in the opinion of the council there is no public need for the public park, playground and athletic field to be established, as set forth in the bill."

The city then moved the court to dissolve the injunction and dismiss the bill, both of which motions the court overruled and entered a final decree, perpetuating the injunction and requiring the city to restore the streets.

The learned chancellor filed with the record in the case an able opinion setting forth his views and embodying his reasons for thus disposing of the case. In that opinion the issues are discussed under two heads:

1. Involves the question as to whether authority has been conferred upon the city council of Lynchburg to close any of its streets and use them as an athletic field and stadium; and (2) If it has no such authority, can a court of equity prevent such closing and diversion to other use at the suit of complainants?

The lower court answered the first question in the negative and the second question in the affirmative. We feel that the chancellor erred in so holding, and that the decree entered in this cause in the corporation court should be reversed.

The case was very ably argued before this court orally and in the briefs, both on behalf of the appellants and on behalf of the appellees.

We will discuss the case upon the issues raised by the bill and answer and the agreed facts, upon the motion to dissolve the injunction and dismiss the bill. They are:

(1) The right of the city of Lynchburg to permanently close the streets referred to, and thereafter, under the facts presented by the record here, to use the vacated area together with the lots surrounding such area, which are owned by the city, for a public park.

(2) Whether a park or stadium, such as is contemplated, is a nuisance *per se*.

1. This question is one of first impression in Virginia. It is well settled in Virginia and elsewhere that a city has no authority to divert public streets or any part thereof to the exclusive use of private interest. *Norfolk v. Chamberlaine*, 29 Gratt. (70 Va.) 539; *City of Richmond v. Smith*, 101 Va. 161, 43 S. E. 345; *Smith v. McDowell*, 148 Ill. 51, 35 N. E. 141, 22 L. R. A. 393.

The question here presented is, whether a city, authorized by general act of the legislature or by its charter to permanently close, or vacate, its streets, may, if it acts in good faith, close streets or parts thereof, and convert them when it owns the abutting territory, under the conditions here disclosed, to other public uses.

The first inquiry is, has the city of Lynchburg the authority, under its charter, to close permanently its streets?

[2] Streets are public highways, and hence the legislature has supreme control over them, to open, improve, repair, or to vacate them, *Norfolk v. Chamberlaine, supra; Roanoke Gas Co. v. Roanoke*, 88 Va. 810, 14 S. E. 665; but this authority may be delegated to municipalities, and when so delegated may be exercised by the municipalities to the full extent of the power

conferred. Dillon on Municipal Corp., sec. 1160; Elliott on Municipal Corp., sec. 98; Elliott on Streets and Roads, sec. 1177; Abbott on Municipal Corp., sec. 839; *Roanoke Gas Co.* v. *Roanoke*, 88 Va. 810, 14 S. E. 665; 26 Cyc. 287, 840.

[3, 4] The authority to open and close streets is sometimes conferred by general statutes, and so essential an incident of local government is it that it has been held to have been granted in a general welfare clause in a general statute relating to cities. *Commonwealth* v. *Railroad*, 138 Ky. 749, 129 N. W. 96.

Section 3030 of the Code of Virginia declares that: "Every city and town shall have power to lay off streets, walks, or alleys, *alter*, improve and light the same, and have them kept in good order."

The word "close" is not used in the general statute, but a Florida statute granting authority to cities to improve, *alter*, extend and open streets, etc., was construed in *Florida, etc.* v. *Ocalla, etc.* (Fla.), 22 So. 692, to confer authority to abandon a portion of a street. See also *In re Vacation of Union St.*, 140 Pa. 525, 21 Atl. 406.

[5] The authority to open and close, etc., can undoubtedly be and generally is, conferred by charter. *Home Building Co.* v. *Roanoke*, 91 Va. 59, 20 S. E. 895; *Powell* v. *Wytheville*, 95 Va. 75, 27 S. E. 805; *Harrisonburg* v. *Roller*, 97 Va. 584, 34 S. E. 523.

The charter of the city of Lynchburg, among other things, provides: "To take care, supervision and control of streets, squares and commons, and to CLOSE, extend, widen, narrow, lay out, pave, graduate, improve and otherwise ALTER the streets in said city." (Caps ours.)

Not only, therefore, has the legislature conferred upon the city of Lynchburg by general law the power

to *alter* its streets but it has specifically conferred upon it the power to *close* them, or otherwise *alter* them, by its charter.

[6] The lower court held that the power to close its streets conferred upon the city of Lynchburg by its charter had reference to temporary closure for purposes of repairs or essential work in or upon the streets, etc., and a distinction was made between closing and vacating streets. It would seem to be apparent that it would not only not be necessary to grant the power to temporarily close a street for repair, since to close for repairs is an incident of the duty to keep in repair, but we do not think the authorities, or sound reason, justify this narrow and restricted construction, or the distinction drawn. We have seen that the power to *alter* conferred by general statute has been construed to confer the power to close permanently. Surely the specific power, conferred by charter, to *close* and otherwise alter, is not less comprehensive than the power to alter. It is true that the powers of municipal corporations are limited to those granted in express terms, or fairly implied, as essential to its declared object and purposes, but when language is as unambiguous as that used in the charter here being considered, there seems little to be implied—the *express* grant of power seems clear.

[7] There is ample authority, if any were needed, for holding the terms *"close"* and *"vacate,"* where the closure is permanent, are interchangeably used. Indeed they can have no different meaning when applied to the authority of a city over its streets.

In *People* v. *Atchison, etc.,* 217 Ill. 601, 75 N. E. on p. 575, the court uses the words interchangeably: "It may also be conceded that, in carrying out a general plan to require railroad tracks to be elevated in a city

like Joliet, some change in, or even vacation or closing up of, some of the streets and alleys may become necessary, in order to effectually carry out the scheme." Again, the same opinion states: "We do not question the power of municipalities to * * authorize the vacation, closing or permanent obstruction of certain of its streets and alleys." And, speaking directly to the point, it states: "Practically to permanently close up a street is to vacate it."

In the case of *In re West 151st Street,* 117 N. Y. S. 841, 132 App. Div. 867, the court, in dealing with the effect of a closing of a public street, said: "West 151st Street, from Riverside Drive extension to the bulkhead line, became legally closed and ceased to exist as a public street when the appropriate resolutions to that end were adopted by the board of estimate and apportionment, the map filed and commissioners of appraisal appointed. * * * As has been frequently pointed out, 'closing' of a street under the act of 1895 has two meanings. So far as the legal discontinuance of the street is concerned, it becomes complete when the prescribed map is filed indicating the proposed change."

So in *Jameson* v. *Louisville, etc.,* 176 Ky. 654, 197 S. W. 386, the power to vacate permanently a street is referred to as the power to close.

This is the common sense interpretation of the word "close" and the authorities cited bear out this interpretation.

In *Stone* v. *Greenville,* 111 S. C. 78, 96 S. E. 520, the court said: "To 'open' and 'close' streets are the opposite of each other."

The use of the word "close" in the Lynchburg charter was intended to mean the opposite of "open," which is also used, and it was the purpose to grant the power as fully in one direction as in the other.

[8] The rule of construction is to give words their ordinary meaning unless a contrary meaning is clearly intended.

It seems obvious from the foregoing that the intention of the legislature was to confer upon the city of Lynchburg, co-extensively with the power to open such streets as were deemed necessary for the accommodation of the public, the power to close such streets permanently as were no longer needed, and it used the words which would most clearly indicate that purpose.

[9] It is, of course, true, generally speaking, that streets can only be closed, in the exercise of judgment and discretion of the city council, for the public welfare. They cannot be obstructed or partially or temporarily closed for the benefit of private interests. *Chambers* v. *Roanoke, supra; Richmond* v. *Smith, supra; People* v. *Alkins*, 295 Ill. 165, 128 N. E. 913; *Windle* v. *Valparaiso*, 62 Ind. App. 342, 113 N. E. 429.

[10] When the power to vacate or close streets has been delegated to a municipality, in the absence of a showing that the closure was for solely private benefit, or that it was the result of collusion or fraud, it is the exercise of a political or legislative function which the courts will not review. 28 Cyc. 948-9; Elliott on Roads and Streets, sec. 1182; Abbott on Municipal Corporations, sec. 739. Cases cited by these authorities support the principles enunciated in the text. *Roanoke Gas Co.* v. *Roanoke*, 88 Va. 810, 14 S. E. 665; *Harrisonburg* v. *Roller*, 97 Va. 582, 34 S. E. 523; *Ferguson* v. *Board*, 133 Va. 561, 113 S. E. 860; *Brown* v. *Board*, 124 Col. 274, 57 Pac. 82; *Taft* v. *Washington, etc.*, 127 Wash. 503, 221 Pac. 604; *State* v. *Board*, 100 Minn. 150, 110 N. W. 1121, 9 L. R. A. (N. S.) 1045.

The bill in the instant case admits that the closing of the portions of the streets mentioned is not for the

benefit of private interests and there is no allegation that there was fraud or collusion, and, as stated, we think the power to close streets had been clearly delegated to the city of Lynchburg by its charter.

[11, 12] While it is true that the municipality holds the streets in trust for public purposes, and that it cannot put them to any use inconsistent with their uses as streets, yet this principle does not interfere with the municipality's authority to close them when that authority has been granted, and the power to close streets may be exercised whether they were acquired by dedication or by condemnation. 28 Cyc. 943; *Glasgow* v. *St. Louis,* 107 Mo. 198, 17 S. W. 743. We refer to this especially because so much is made of the trust arising from dedication, both in the opinion of the lower court and in the argument. If the street is legally closed, the trust ends, so far as maintaining it as such is concerned.

But it is contended that the closing of portions of Court and 13th streets, by resolution or ordinance of the city council, was illegal because such closing resulted in damaging the private property of complainants without compensation, in violation of the Federal and State Constitutions. The contention is based upon the idea that complainants have, in addition to the right of the public generally to use the streets of Lynchburg, that is the public right, a private right of way by easement over Court and 13th streets for the full distance of the block because their lots abut on one or the other of these streets, although not on any of the closed portions thereof. It is contended that this is a private property right which cannot be taken for public use without due process and the payment of compensation. Of course, if they have such a private property right and such right has been taken from them or damaged

they are entitled to their day in court and to compensation.

To make the ground upon which this claim is based tenable, complainants must have a *private right*, as distinguished from a *public right*, a right in common with the public generally. There must be a taking or damaging of private property for public use, without compensation.

[13, 14] Ordinarily, that is in the absence of a grant affecting the right of a lot owner abutting on a street, he owns the fee in the land occupied by the street to the center thereof for the full distance of his lot frontage; and in case of abandonment or legal closure of a street the unrestricted use and ownership is in the lot owner. *Paul* v. *Carver*, 24 Pa. St. 211, 64 Am. Dec. 649. He has a public right of way, in common with the general public over such street, and as an abutting landowner he has in addition certain property rights which the public generally does not possess; among them, and, so far as this case is concerned, the only one which is necessary to consider, the right of egress and ingress from and to his lot by way of the street.

[15, 16] We need not consider the complainants' rights to the fee in the streets, because they have not been taken or damaged, and are not involved here. They cannot claim compensation for any but private property rights taken, so, their rights to use the streets in common with the public are not involved. The only question is, have complainants, by virtue of their location, within the blocks shown on the plat, private easements over the closed portions of the streets. If so, and they have been deprived of them, they are entitled to compensation. There is a great conflict of authority upon the general proposition as to whether the bare vacation or closing of a street ever causes, or

can cause, such a damage to private property, the private "easement of way," such as is prohibited by the Constitution of this State, unless compensated for. There are cases which hold, with much sound reason to support them, that merely closing a street is neither taking nor damaging private property for public purposes; that such action is an abandonment of a public right and if incidental or consequential damages result, they are not such as the owner of a lot abutting on the street can recover. California adheres to this doctrine. *Levee Dist. No. 9* v. *L. P. Farmer*, 101 Cal. 178, 35 P. 569, 23 L. R. A. 388. Among other States holding this doctrine are Missouri, Massachusetts, Iowa and Pennsylvania.

In *Paul* v. *Carver, supra*, the Supreme Court of Pennsylvania, in discussing the question, said: "Surrendering the right of way over a public road to the owners of the soil is not taking private property for public use, and the proprietors of other land incidentally injured by the discontinuance of the road are not entitled to compensation. A private road is private property, and an act of assembly to close it up without paying for it would be depriving the owner of his property. But a public road belongs to nobody but the State; and when the government sees proper to vacate it, the consequential loss, if there be any, must be borne by those who suffer it, just as they would bear what might result from a refusal to make it in the first place."

On the other hand, there are cases which hold that the closing of a portion of a street resulting in consequential damage or some inconvenience to a lot owner whose lot abuts on such street but not on the closed portion, is such a damaging of private property as will entitle such lot owner to an injunction to pro-

hibit and enjoin an act in violation of the lot owner's constitutional rights. Among the State courts so holding are Illinois (*Rigney* v. *Chicago*, 102 Ill. 64), Nebraska (*Gottschalk* v. *Chicago, B. & Q. R. Co.*, 14 Neb. 550, 16 N. W. 475), Georgia (*Harvey* v. *Georgia, S. & F. R. Co.*, 90 Ga. 66, 15 S. E. 783), South Dakota (*Hyde* v. *Mine, etc., R. Co.*, 29 S. D. 220, 136 N. W. 92, 40 L. R. A. [N. S.] 48), and New Jersey (*Neward* v. *Hatt*, 79 N. J. Law, 548, 77 Atl. 47, 30 L. R. A. [N. S.] 637).

And again, as will appear from an investigation of the authorities, there is a conflict among those authorities of the latter class, holding what we may term the more liberal view, some holding such lot owner has a right to have the street kept open in each direction unless he is compensated; while others hold that if the street in front of his premises is not closed and if he has convenient access to the streets of the city in one direction, he cannot claim compensation. The inconvenience he suffers is the same inconvenience all other citizens of the State suffer, although probably greater in degree than that suffered by the general public. The idea seems to be that where those conditions exist which involve a right of way or easement over the public streets, by necessity, this is such a private right as will require compensation if it is interfered with. The weight of authority seems to incline to this view, and we think it has with it the weight of reason. *Coster* v. *Albany*, 43 N. Y. 399; *Fearing* v. *Irwin*, 55 N. Y. 486; *Gerhard* v. *Seekonk River Bridge Comrs.*, 2 New Engl. Rep. 619, 15 R. I. 334, 5 A. 199; *Smith* v. *Boston*, 7 Cush. 254; *Polack* v. *San Francisco Orphan Asylum*, 48 Cal. 490; *Kings County F. Ins. Co.* v. *Stevens*, 2 Cent. Rep. 430, 101 N. Y. 417, 5 N. E. 353; *Heller* v. *Atchison, T. & S. F.*

*R. Co.*, 28 Kan. 625; *Castle* v. *Berkshire*, 11 Gray 26; *East St. Louis* v. *O'Flynn*, 8 West. Rep. 85, 119 Ill. 206, 10 N. E. 395, 59 Am. Rep. 795; *Chicago* v. *Union Bldg. Asso.*, 102 Ill. 379, 40 Am. Rep. 598; *Wilson* v. *New York Cent. & H. R. R. Co.*, 2 N. Y. Supp. 65; *Hier* v. *New York W. S. & B. R. Co.*, 109 N. Y. 659, 17 N. E. 867.

This view is well expressed in *Gerhard* v. *Seekonk River Bridge Com'rs*, 15 R. I. 334, 5 Atl. 199. The court in a *per curiam* opinion there said: "The question is whether abutters upon a public street, simply as abutters, have any right of travel in the street, as against the State, which would entitle them to compensation if the street be obstructed under the authority of the State, in a case where no portion of the street in front of their abutting estates is occupied or obstructed. We do not think that they have any such right. The easement of travel which they enjoy is a public easement, and they enjoy it simply as a portion of the public. It is competent for the State, representing the public, to authorize the entire discontinuance of a street, and *a fortiori* its partial obstruction, at least so long as the abutters have, as they have in the present case, *access* and *egress* to and from their estates by other ways. This was expressly so decided in *Fearing* v. *Irwin*, 55 N. Y. 486; *Paul* v. *Carver*, 24 Pa. St. 207 [64 Am. Dec. 649]; *Bauer* v. *Andrews*, 7 Phila. 359; and see, also, *State* v. *Dexter*, 10 R. I. 341; *People* v. *Supervisors of Ingham Co.*, 20 Mich. 95."

Michigan is one of the States which does not hold to what may be termed the extreme view enunciated by the Pennsylvania, Massachusetts and other State courts. In the case of *Christian B. Buhl* v. *Fort Street Union Co.*, 68 Mich. 596, 57 N. W. 829, 23 L. R. A. 392, where the situation of the plaintiff was identical

with that of complainants here and where the applicability of the identical constitutional provision here invoked was discussed, the Supreme Court of that State, in an able opinion, in which it reviewed exhaustively all the conflicting authorities, said: "There is left to the plaintiff an approach to their property by the State street bridge, though less near, less easy, less commodious. The damage to the plaintiff's property from this cause is entirely indirect and remote. It is not claimed to the contrary, and we shall assume that the State had the right, by virtue of this act, or from other source, to do this work, and in doing it to remove this bridge. The bridge, so far as the plaintiffs were interested in it, was but a part of a public street or highway. Over streets and highways the legislature has control, and may, when no private interests are involved or invaded, close them and altogether relinquish their use by the public. And if in the exercise of this right a street be discontinued, and the value of lands abutting on other parts of the street, and on neighboring streets, is lessened, it is not such an injury to the owner as to entitle him to damages. In *Glasgow* v. *St. Louis*, 107 Mo. 204 [17 S. W. 743], the plaintiff sought to enjoin the vacation of Twelfth street, one block south of property owned by plaintiff, lying between Thirteenth and Fourteenth streets. The situation of the property was not materially different from the property of the plaintiff in the present case. The court says: 'There is no doubt but a property owner has an easement in a street upon which his property abuts which is special to him and should be protected, but here the plaintiffs own no property fronting or abutting on the part of the street which was vacated. Their property is surrounded by streets not touched or affected by the vacating ordinance.

They will be obliged to go a little further to reach Twelfth street, but that is an inconvenience different in degree only from that suffered by all other persons, and it furnishes no ground whatever for injunctive relief. Nor are the plaintiffs entitled to any relief by reason of the clause in the present constitution which declares "that private property shall not be taken or damaged for public use without just compensation." To entitle them to relief because their property will be damaged, though not taken, they must show a special injury. Here there is no physical interference with their property, nor is any right or easement connected therewith or annexed thereto affected. They will, therefore, suffer no injury which is special or peculiar to them. The inconvenience, if any in reality there is, is the same as that cast upon other persons. For these reasons the constitutional amendment furnishes them no ground for complaint.'

"We think the weight of authority in this country fully sustains the contention of defendant that such an injury as that resulting to the plaintiff here is one which he suffers in common with the general public, and *damnum absque injuria.*"

See also *Wetherill* v. *Pa. R. Co.*, 195 Pa. 156, 45 Atl. 658; *McGee's Appeal*, 114 Pa. 470, 8 Atl. 237; *San Francisco* v. *Spring Valley Water Works*, 48 Cal. 493; *City of Chicago* v. *Union Sch. Ass'n*, 102 Ill. 379, 40 Am. Rep. 598; *Steenerson* v. *Fontaine*, 106 Minn. 225, 119 N. W. 400; *Barr* v. *Oskaloosa*, 45 Iowa 278; *Levee Dist. No. 9* v. *L. P. Farmer*, 101 Cal. 178, 23 L. R. A. 388.

Viewing the situation as it is disclosed by the record, we do not think complainants were entitled to injunctive relief because their constitutional rights were invaded or because the resolution of the council of the

city of Lynchburg closing the portions of Court and 13th streets was invalid on this account.

We think, as heretofore shown, that the legislature vested the power to close streets in the city council by its charter, and that the resolution of the council closing these streets was equivalent to an act of the legislature closing them.

[17, 18] It is claimed, however, that streets, or portions of streets, cannot be vacated and such streets or portions thereof diverted to other public uses. This contention is not tenable, we think, under the circumstances disclosed by the record here and where the public purpose to which they are put is within the scope of the city's authority.

By subsection 5 of section 9 of the city charter, as amended by act of the General Assembly approved March 21, 1923 (Laws. 1923 [Ex. Sess.], c. 51), it is provided that the city council shall have authority "to erect and keep in order all necessary public buildings; to establish and regulate public squares, playgrounds, and parks in or near the city, and to acquire by purchase, condemnation, or otherwise, the land it may deem necessary for such uses, and to construct in such public squares, playgrounds or parks as it may maintain, or *upon any city property* (italics ours), stadiums, swimming pools and recreation or amusement buildings, structures, or enclosures of every character, refreshment stands, restaurants, *et cetera.*"

Thus the city of Lynchburg is specifically given authority to establish parks, playgrounds, stadiums, etc., and to acquire lands therefor by purchase, condemnation, or otherwise, or to establish or build them upon city property.

The city council of Lynchburg could not use, or

permit to be used, the streets of the city for private or public purposes, other than as streets; but once a street is lawfully closed, it is no longer a street, and the city may use the vacated area for any public purpose to which it may be legally dedicated. It may have to acquire the fee by purchase, it is true, by condemnation, or otherwise, but if it owns the fee it may use it for any public purpose authorized by its charter.

Thus in *Knapp* v. *City*, 153 Mo. 560, 53 S. W. 104, it is said: "So long as a street is a street, it is held by the city in trust for the public and cannot be lawfully appropriated to a mere private use; and, so long as it is a street, an abutting propertyholder may invoke injunctive relief to prevent its being devoted to private purposes; whereas the power to vacate rests upon the grant to the city to determine when the purposes for which the streets have been enacted have been subserved, and to dispense with the further maintenance thereof   *   *   * ."

[19] In the instant case the city owns all the land abutting on the closed portions of the streets, and if they were lawfully closed the fee in the land formerly occupied by the streets is in the city, and under authority of the charter, quoted above, can be used along with the surrounding territory, which the city also owns, for the establishment of a park or stadium, or for any other purpose authorized by law. *Paul* v. *Carver, supra; Palmer* v. *Dougherty,* 33 Maine, 502, 54 Am. Dec. 636.

If this were not true, it is perfectly obvious that in many cases public improvements of commanding importance might be prevented by ancient acts of dedication, never designed to serve as definite obstructions to municipal growth and public progress.

All the cases cited by opposing counsel and the court below, as authority to the contrary, will be found to deal with obstructions in, or encroachments upon, or inconsistent uses of streets that had not been permanently closed, and as to which the duty to keep them open as public streets still existed, or where they were closed for merely private interests. *Chambers* v. *Roanoke,* 111 Va. 254, 68 S. E. 980, so much relied on by complainants, is distinguishable from the instant case upon this point.

Cases of great interest in this connection are, *Lockwood* v. *Portland,* 288 Fed. 480; *People* v. *Atkins,* 295 Ill. 165, 128 N. E. 913; *Weaver* v. *Railroad,* 227 Ill. 421, 81 N. W. 424, 11 L. R. A. [N. S.] 589; *People* v. *Harris,* 203 Ill. 272, 67 N. E. 785, 96 Am. St. Rep. 304; *Snyder* v. *City,* 176 Ill. 397, 52 N. E. 62, 44 L. R. A. 407; *Pettit* v. *Grand Junction,* 119 Iowa 352, 93 N. W. 381; *Dean* v. *Ann Arbor, etc.,* 137 Mich. 458, 100 N. W. 773; *In re East 168th Street,* 28 App. Div. 143, 52 N. Y. S. 593; *Reis* v. *City,* 113 App. Div. 464, 99 N. Y. S. 291; *Harrington* v. *Railroad,* 126 Iowa 388, 102 N. W. 139; *Spitzer* v. *Runyan,* 85 N. W. 782; *Pence* v. *Bryant,* 34 W. Va. 263, 46 S. E. 275; *State* v. *Board,* 100 Minn. 150, 110 N. W. 1121, 9 L. R. A. (N. S.) 1045.

2. The bill alleges that the establishment of a public park or stadium contemplated by the city will constitute a nuisance *per se* which will so peculiarly damage the·property of complainants and injure them in the use and enjoyment of it that they cannot be compensated in damages, and that, therefore, they are entitled to injunctive relief.

[20] It is a well established principle of equity jurisprudence that where a proposed structure, or the use of it, is not a nuisance *per se,* a court of equity will not

grant an injunction against the erection of the structure or the use, merely because it may become a nuisance. The alleged nuisance must be the necessary result or the court will await the actual results. 29 Cyc. 1222; Woods on Nuisance, sec. 977; *Thornton* v. *Roll*, 118 Ill. 350, 8 N. E. 145; *Alexander* v. *Tebeau*, (Ky.), 71 S. W. 427; *Robinson* v. *Dale*, 62 Tex. Civ. App. 277, 131 S. W. 308; *Pfingst* v. *Seen*, 94 Ky. 556, 23 S. W. 358; *Dalton* v. *Railway*, 144 Ind. 121, 43 N. W. 130; *Harrisonburg* v. *Roller*, 97 Va. 582, 34 S. E. 523; *Bowen* v. *Mauzy*, 117 Ind. 258, 19 N. E. 526; *Robinson* v. *City*, 136 Ind. 166, 36 N. E. 644.

Is the proposed athletic field a nuisance in itself?

[21] *Fisher* v. *Seaboard, etc.*, 102 Va. 369, 46 S. E. 381, 1 Ann. Cas. 622, and *Smith* v. *Alexander*, 33 Gratt. (74 Va.) 208, 36 Am. Rep. 788, are authority for the proposition that that cannot be a public nuisance which the law authorizes. In the former case the court said: "I think it is agreed on all hands that if the legislature authorizes the doing of an act which, if unauthorized, would be wrong and a cause of action, no action can be maintained for that act, on the plain ground that no court can treat that as wrong which the legislature has authorized, and consequently the person who has suffered a loss by the doing of that act is without remedy, except in so far as the legislature has thought proper to provide for compensation for him."

[22] The General Assembly of Virginia has definitely provided, by general statute, that all cities of the Commonwealth shall have power to "establish and maintain parks and play grounds * * ." Va. Code, sec. 3030. See Acts 1924, chap. 35. And it has specifically authorized the city of Lynchburg, in its charter, "to establish and regulate public squares, play grounds

and parks in * * the city; * * * and to construct in such public squares, play grounds or parks as it may maintain, or upon any city property, stadiums, swimming pools and recreation or amusement buildings, structures or enclosures of every character * *." Acts 1923, ch. 51.

It is perfectly obvious that every contemplated use of the property of the city, including the portions of the streets closed for the purpose, is one that has been specifically authorized by the sovereign power of the State.

The court cannot hold such use to be a nuisance. On the contrary, it is constrained by every legal principle to hold, as matter of law, that the mere establishment of the park, playground and athletic field, and the mere construction of the stadium thereon, cannot be a nuisance *per se.*

[23] It may be admitted that there is a possibility that the proposed agencies of public service may be so conducted as to create a nuisance. In that event the court would have full power, upon proper proceedings, to enjoin that which is unlawful. But it cannot be assumed that the city will permit such a nuisance to be created. That would be to anticipate a condition that is neither necessary nor likely to follow the establishment of an instrumentality designed solely to promote the public health, recreation, amusement and pleasure. It is authorized by the legislature. It is deemed in the interest of the public welfare by the city council. Beyond this the court may not inquire.

[24] But aside from the fact that the proposed park is to be established by express authorization of law, it has been held that, where not established by municipal authority under charter, a playground for children is not a nuisance *per se. Riffey* v. *Rush,* (N. D.)

199 N. W. 523. A pleasure garden is not a nuisance *per se.* *Pfingst* v. *Senn*, 94 Ky. 556, 23 S. W. 358, 21 L. R. A. 569; nor is a public dance hall, *Thoembe* v. *Mosby*, 257 Pa. 1, 101 Atl. 98; nor a theatre with its crowds and music and incidental noises, *Lyric Theatre Co.* v. *State*, 98 Ark. 462, 136 S. W. 175; nor is the playing of baseball games in the vicinity of residences, 20 R. C. L. 419, and cases cited; *Alexander* v. *Tebeau*, 132 Ky. 487, 116 S. W. 356, 18 Ann. Cas. 1092.

From what has been said it is apparent that if the city council of Lynchburg had authority under its charter to close streets, and to establish a park, playground, or stadium on the vacated area and the surrounding lots, and we cannot doubt that it had authority to do both, and if the park or playground is not of itself a nuisance, it follows that complainants are not entitled to relief in equity by way of injunction, but if they have suffered injury they are entitled to such damages as the closing of the streets has inflicted upon them.

[25] As we view it, therefore, neither the closing of the streets nor the establishment of the park was an *ultra vires* act, nor does the bill show wherein complainants suffered any special or peculiar damages, or damage to private property, as distinguished from the damage sustained by the public at large. Such injury as they have suffered, if any, differs only in degree, and not in kind, from that suffered by the public. See *Bowe* v. *Scott*, 113 Va. 499, 75 S. E. 123. They allege irreparable injury, but they allege no facts to show it, and the mere allegation is not sufficient. 22 Cyc. 891-2; *Forchenner* v. *Mobile*, 84 Ala. 126, 4 So. 112; *Port of Mobile* v. *Railway*, 84 Ala. 115, 4 So. 106; 5 Am. St. Rep. 342; *Town of Orange City* v. *Thayer*, 45 Fla. 502, 34 So. 573; *Cicero* v. *Town*, 176 Ill. 9,

51 N. E. 758, 42 L. R. A. 696, 68 Am. St. Rep. 155; *Coykendall* v. *Hood*, 36 App. Div. 558, 55 N. Y. S. 718; *Schultz* v. *City*, 27 Miss. Rep. 51, 57 N. Y. S. 963; *St. Peters* v. *Washington*, 109 N. C. 21, 13 S. E 700.

So that upon the whole we are of opinion that the legislature conferred upon the city of Lynchburg by its charter the power to close or vacate streets; that the city has legally closed certain parts of Court and 13th streets, and has used the closed area, the fee of which is in the city, along with the abutting lots for a public purpose and one authorized by the charter in the interest of the general welfare; that so far as the record shows the city council has, in good faith, exercised its judgment and discretion for the general welfare of the public; and that such being the case, the courts have no power to interfere.

We are of opinion, therefore, to reverse the decree of the lower court, and to enter a decree dissolving the injunction and dismissing the complainants' bill.

*Reversed and rendered.*