## Richmond

### The American Oil Company v. John Randolph Leaman, Jr.

January 20, 1958.

Record No. 4706.

Present, All the Justices.

The opinion states the case.

*T. Justin Moore* and *Ralph H. Ferrell, Jr.* (*Charles E. Ford; Murray, Ford, West & Wilkinson; Hunton, Williams, Gay, Moore & Powell,* on brief), for the appellant.

*E. Ralph James* and *J. B. Cowles, Jr.* (*James, Richardson & James,* on brief), for the appellee.

MILLER, J., delivered the opinion of the court.

On June 22, 1955, John Randolph Leaman, Jr., instituted suit against the American Oil Company, hereinafter called Amoco, and sought restrictive and mandatory injunctive relief against that corporation. He alleged that he was the owner of two lots of land, together with a residence, and as appurtenant thereto, owned an easement in common with others in a road 30 feet wide that afforded ingress and egress to and from a public highway known as Goodwyn's Neck Road, and that Amoco had wrongfully obstructed the road. He prayed that Amoco be restrained from interfering with his use of the easement and required to remove all obstructions that it had placed in the road.

In Amoco's answer, it admitted that in the erection of a petroleum refinery it had filled in the road and installed facilities on the area embraced in the easement, and had erected near thereto expensive and permanent improvements that would be seriously damaged if it were required to reopen the road. However, it asserted that ample and convenient ingress and egress to and from Leaman's lots, and the land of others who had enjoyed the easement in common in the 30-foot road, was afforded by State route 631, known as Waterview

Road, and that the easement had been abandoned by those entitled to use it. It also alleged that State route 630, known as Goodwyn's Neck Road, had been abandoned by public authority, and that the purpose for which the easement was granted had ceased to exist, and it had been extinguished.

Amoco also insisted that the easement was not necessary to the convenient use of Leaman's property and reopening of the road should not be ordered even though the easement had not been abandoned or extinguished, but it should be allowed to respond in damages to Leaman.

A motion made by Amoco that the court receive evidence having to do with the balance of convenience, the value of Leaman's easement, and the relative damage that would result to the parties by refusal or award of an injunction was denied. The evidence upon the other issues was heard *ore tenus*, and after consideration of the testimony and numerous exhibits, the chancellor found that Leaman had never abandoned his easement in the road, nor had it been extinguished. An injunction was awarded which required Amoco to remove all obstructions placed on the 30-foot easement or right of way and to restore the road to the condition that existed before it was obstructed, and Amoco was perpetually enjoined from obstructing or in any wise interfering with its free and uninterrupted use by Leaman, his successors and assigns. From that decree Amoco appealed.

It is conceded by Amoco that the evidence sustains the finding that Leaman had not abandoned his easement.

The several errors assigned may be consolidated and stated thus:

The chancellor erred (1) when he failed to hold that the purpose for which the easement was granted had ceased and the easement was thereby extinguished; and (2) he abused his judicial discretion when he refused to receive evidence relating to the balance of convenience and direct an inquiry as to the damages that should be awarded to Leaman in lieu of a mandatory injunction if the easement had not been extinguished.

To present a picture of the location of the roads in the area, and to aid the reader to visualize the progressive changes made by the extension, abandonment and relocation from time to time of private and public roads in the vicinity, reference will be made to three maps (Figures 2, 5, and 6) introduced in evidence and here reproduced.

MAP OF GOODWYN'S NECK

AS OF JANUARY 29, 1942.

SCALE 1"=1500'     FIGURE 2

MAP OF GOODWYN'S NECK
As of November 30, 1955-August 13, 1956

SCALE 1"=1500'     FIGURE 5

# MAP OF GOODWYN'S NECK

Showing Roads Upon Completion Of
Tripartite Agreement Of I September 1954

SCALE 1"=1500'    FIGURE G

Legend
——— Public Road.
······ Former Private Road Easement.

Figure 2 outlines and pictures the areas owned by different persons and the location of private and public roads in the vicinity on January 29, 1942. Figure 5 illustrates the changes made subsequent to January 29, 1942, and shows the property lines and the location of the roads as of November 30, 1955-August 13, 1956. Figure 6 shows the roads and pictures the area subject to unimportant variations as it existed after completion of the obligations and undertakings embodied in an agreement of September 1, 1954, between Amoco, the Board of Supervisors of York county, and the Commonwealth of Virginia, Department of Highways, referred to herein as the tripartite agreement.

On and prior to January 29, 1942, State routes 630 (Goodwyn's Neck Road), 631 (Waterview Road), and 173 existed as shown by solid black lines on Figure 2.

J. Marshall Lewis, George P. Coleman, Herman A. Pohlig and Bertha Olga Pohlig were at that time the owners of land bordering on and lying south of the southern shore of the York river in the Goodwyn's Neck area, York county, Virginia. Their tracts of land were situated near to, intersected by and bordered upon routes 630, 631, and 173. On January 29, 1942, the owners and their consorts entered into a deed and agreement, with attached plat (called the Lewis-Coleman-Pohlig deed and agreement), wherein among other things, they subdivided Block 1, Section B of Waterview subdivision and extended the Waterview Road as a private easement road eastwardly and parallel with the York river along the rear of the lots in Block 1, Section B, a distance of 3021 feet as indicated by the dotted line on Figure 2. This deed and agreement also created a 30-foot private road easement from the south side of the Waterview Road extended, running in a southerly and southwesterly direction through the land of J. Marshall Lewis and along the line between the Lewis and Coleman properties 2351 feet (0.445 mile) to State route 630 as then located. Portions of this deed and agreement that relate to these two road easements are:

"1. All of the parties hereto do hereby grant, bargain, sell, and convey to the other of the parties hereto an easement of right of way in common to be used jointly by the said parties and their respective heirs and assigns, in and to the roads shown on the blueprint map hereinabove mentioned, designated as Waterview Road and as 30 foot road, through and along the lands shown on said blueprint map, as a means of ingress and egress to and from the lands thereon shown,

over, along and upon the entire length of the said roads shown on said blueprint map out to the public highway known as Goodwyn's Neck Road, including access to such Goodwyn's Neck Road along said 30 foot road, as well as along the Waterview Road, both in its respective 30 and 40 foot widths and locations. * * *

* * * * * * *

"3. The Waterview Road shown on said blueprint map and the 30 foot road shown thereon, leading from said Waterview Road in a southerly direction, and thence in a southwesterly direction out to the Goodwyn's Neck Road, are both of the width of 30 feet, except at the intersection of said two roads, at which intersection the corners are to be curved and widened as shown on said blueprint map."

In this instrument the parties also agreed and bound themselves to a continuing offer to dedicate the two 30-foot roads to York county or the Commonwealth of Virginia, but expressly provided that there should be no obligation upon any party to the agreement to construct or maintain the roads.

Upon execution and delivery of the Lewis-Coleman-Pohlig deed and agreement, the parties to the instrument and their successors in title were afforded two means of ingress and egress to and from their property. Along the road parallel with the York river, upon which the lots abutted, they had access to and from State route 631, and thence over that road to route 630. Over the 30-foot road easement extending southwardly from Waterview Road, they had access to route 630. By this latter route the distance to Dandy and vicinity from Block 1, Section B, Waterview Subdivision, was 2.375 miles less than by way of route 631 to its junction with route 630, and thence eastwardly to Dandy.

On February 21, 1942, J. Marshall Lewis and wife conveyed lots 2 and 3 in Block 1, Section B of Waterview to Leaman. These are the second and third lots to the east of the Pohlig block of land on Figure 2, and on their southern edge, they abut the north line of Waterview road as extended. They are located within 100 feet of and across Waterview Road from the northern extremity of the easement road that extends southwardly from Waterview Road to route 630.

This deed from Lewis and wife to Leaman referred to the Lewis-Coleman-Pohlig deed and agreement and contains the following provision:

"* * * Together with all rights appurtenant to the said lots as the same may appear of record relating to the creation of easements by Jamestown Corporation, and together also with the right to use Waterview Road as heretofore dedicated, in a westerly direction and thence in a northerly (sic) direction out to the Goodwyn's Neck Road, and together with the right to use the Waterview Road and the 30 foot road shown·on the blueprint map hereinabove mentioned such rights being in common with others; * * *."

Prior to 1950 the State accepted dedication of the extension of route 631 and hard-topped route 631 (Waterview Road) across the Pohlig land and on eastwardly to the full extent provided for and dedicated in the Lewis-Coleman-Pohlig deed and agreement. When this eastern extension of the Waterview Road was accepted by the State and taken into its secondary highway system prior to 1950, Leaman's private easement in common over this area of the Water- view road was extinguished, but there has been no acceptance of the offer of dedication of the easement road extending southwardly from route 631 to route 630.

During the period between 1942 and 1950 maintenance of the 30-foot private road easement extending southwardly from Water- view Road was a problem and in wet weather it was difficult to travel. One of Leaman's witnesses who hauled sand and filled ruts in the road before 1950 described its condition saying that "in foul weather it was in foul shape and in good weather it was in fair shape." Subsequent to 1950, and after the extension to route 631 had been accepted by the State, that road was used more frequently and it furnished an easy means of ingress and egress to and from Waterview. Though the 30-foot private easement extending south- wardly to route 630 furnished a shorter route to the Dandy neigh- borhood, it was allowed to remain in poor condition, yet it was used at times by Leaman and others, and he never abandoned his rights in the road.

Negotiations for acquiring lands in the Goodwyn's Neck area upon which to erect an oil refinery were initially made by Esso Standard Oil Company, which secured options on numerous tracts of land. Esso's options were acquired by Amoco's predecessor, the Pan American Oil Company (referred to herein as Pan-Am), and that corporation also acquired options on other parcels of land. Rep- resentatives of these corporations discussed with the York county Board of Supervisors (hereinafter called the Board) and represen-

tatives of the State Highway Department the feasibility of the abandonment of public roads in the area and construction of a new road in lieu of the Goodwyn's Neck Road. The abandonment of portions of route 630 was desired by Amoco so that a suitable plant site for the refinery could be laid out.

On July 15, 1954, the assistant resident engineer of the State Highway Department petitioned the Board to establish a new public road (new route 173) in lieu of existing public roads which were to be abandoned. Though a new location for route 173 was not approved by the Board until later, yet on July 15, 1954, it unanimously approved the proposed abandonment of 2.2 miles of route 630 extending eastwardly from its intersection with route 631. The Board's resolution shows that the proposed abandonment of this stretch of route 630 was "to be processed under Alternate Law (Section 33-76.12) in lieu of the service to be rendered by the new location of Route 173," and was to be undertaken in coordination with the construction of the contemplated oil refinery and the "construction of new Route 173 by the Department of Highways."

On August 31, 1954, Amoco purchased from Pan-Am approximately 1165 acres in the Goodwyn's Neck area which included the land between Waterview Road and Goodwyn's Neck Road on both sides of the 30-foot easement and all the land on the north and south sides of that portion of route 630 which was later abandoned.

While Pan-Am and its successor, Amoco, were considering the acquisition of this property, and before clearing the site for the oil refinery began, the 30-foot road was in poor condition. One witness said that in July and August 1953, there was a large water-filled hole near its southern terminus and "it was not a passable road from the standpoint of vehicles," and appeared to be "an abandoned road."

In the "Tripartite Agreement" it was provided that to enable Amoco to develop its property and operate its business, which would "be of benefit to the Commonwealth and particularly to (the) county" and the adjacent areas and vicinity, a new modern public highway would be constructed upon an 80-foot right of way to be filled in and conveyed by Amoco to the Highway Department "without monetary consideration" as replacement for the portion of route 630 within the perimeter of Amoco's property; that the Board and Highway Department would cooperate in causing that portion of route 630 and portions of other specified secondary roads to be abandoned as public roads "by due process of law." It was also provided in this

agreement that the county and Commonwealth would relinquish the land within the abandoned stretches of public road "to the owner of the fee underlying and adjacent to the same * * *," for neither the Commonwealth nor county enjoyed fee ownership in the roads. *Bond* v. *Green*, 189 Va. 23, 52 S. E. 2d 169. Figure 6 represents a fair picture of what was contemplated and accomplished under this agreement.

During the fall of 1954, after execution of this agreement, Amoco started filling in the land upon which its refinery and facilities were to be constructed, which included the area within the 30-foot easement. In the spring of 1955 Leaman's attorney requested Amoco's local manager to remove its obstructions from the easement road so that interested property owners might continue its use but this request was not granted.

On May 19, 1955, the Board adopted a resolution in which it stated that it had requested Amoco to construct a temporary road twenty feet wide (which was later designated temporary route 630), in accordance with State specifications, to serve the people in the Dandy community until new route 173 was constructed by the Highway Department and asked the State Highway Department to close or barricade route 630 when the temporary road was built by Amoco. Three months later the Board directed its clerk to notify the Highway Department that the alternate road constructed by Amoco "adequately serves the same citizens previously served by Route # 630."

At a meeting of the Board on October 20, 1955, it added temporary route 630 to the secondary road system. At that meeting and at a subsequent meeting of November 7, 1955, the Board, by resolutions regularly adopted, abandoned all of Goodwyn's Neck Road that extended southwardly from the southern terminus of the easement to its intersection with temporary route 630. These actions of the Board were approved by the deputy Highway Commissioner on October 27, 1955, and November 30, 1955. As a result of this action of the Board in abandoning and closing these portions of route 630, the 30-foot private road easement no longer connected with that secondary State route but came to a dead end within the property of Amoco as indicated on Figures 5 and 6.

Amoco insists that this case was tried in the lower court under the assumption and theory that route 630 had been legally abandoned to the extent and as indicated on Figure 6, and its legal abandonment

is now "the law of the case." That is not admitted by Leaman. Nor does the record disclose whether or not the chancellor, in arriving at his ultimate decision, decided that route 630 had been legally closed. Yet counsel for both parties expressly stated in argument at bar that the evidence bearing upon whether or not route 630 had or had not been legally abandoned and closed has been developed, and that issue may be now decided by this court.

■ The abandonment of route 630 in varying stages by the Board as a part of the secondary system of highways was accomplished while a new road was in process of construction. In the abandonment of this secondary route, the Board proceeded under § 33-76.12, Code 1950, with the consent and approval of the State Highway Commissioner. That section of the Code provides as follows:

"When any road in the secondary system or any road in the secondary system containing a railway-highway grade crossing, has been or is altered and a new road, which serves the same citizens as the old road is constructed in lieu thereof and approved by the State Highway Commissioner, the old road and/or the public crossing may be abandoned to the extent of such alteration, but no further, by a resolution of the board of supervisors or other governing body of the county, declaring the old road and/or the public crossing abandoned."

Leaman insists that the Board should have adopted the procedure prescribed by § 33-76.8, Code 1950, which, among other things, provides for posting and publication of notice of the application to abandon and a public hearing upon petition of the State Highway Commissioner or any affected landowner in the county. When the procedure prescribed in this section is used, the succeeding section 33-76.9 gives a right of appeal to the circuit court of the county to any petitioning landowner or the State Highway Commission. The court then determines whether public necessity exists for the continuance of the section of road sought to be abandoned or whether the welfare of the public will be best served by abandoning the section of the road. However, it is to be observed that when abandonment proceedings are undertaken under § 33-76.12, the construction of a new road in lieu of the old which serves the same citizens as the old road is contemplated. The more complex procedure provided for in § 33-76.8 is not predicated upon, nor does it require, construction of a new road in lieu of the abandoned road.

The Board was not required to adopt the procedure provided for in this section but could act as it did under § 33-76.12.

It is needless to set out at length the several resolutions adopted by the Board when it materially altered or abandoned at different times sections of secondary route 630 and finally located and established new primary route 173 as shown by the several maps. It is sufficient to say that in effecting these alterations and abandonments, the Board on four occasions made the finding of fact and declared, as required by § 33-76.12, that the new road would "serve the same citizens as the old road."

The phrase, "a new road which serves the same citizens as the old road * * *" is to be liberally construed and a wide discretion must be accorded the Board in its determination to abandon or alter a road, otherwise the purpose of the statute enacted for the benefit of the public would be impaired or defeated. When the road to be altered or abandoned is not a way of necessity and does not abut the property of an objector but is reached by traveling over or across another public road that abuts the objector's property, a finding by the Board that the new road serves the same citizens as the old road may not be successfully challenged in the absence of fraud or flagrant hardship evidencing abuse of discretion by the Board.

The General Assembly made no provision for an appeal to a court from the Board's findings and action under this section. In the absence of such a provision we may not review the Board's action in the absence of fraud or manifest abuse of discretion. 25 Am. Jur., Highways, § 120, p. 418; Elliott, *Roads and Streets*, 4th ed., Vol. 2, § 1182, p. 1683; *City of Lynchburg* v. *Peters*, 145 Va. 1, 133 S. E. 674.

No fraud is charged. Yet Leaman insists that the Board abused its discretion by determining that the new road served the same citizens as the old road. He also charges that route 630 was abandoned solely for the benefit of Amoco. He argues that because new route 173 does not connect with the 30-foot easement road, it does not serve the same citizens as did abandoned route 630. However, the undisputed facts show that by using route 631 on which his lots abut, Leaman can reach and is served by new route 173.

After extension of route 631 eastwardly beyond Leaman's lots and to the extent contemplated in the Lewis-Coleman-Pohlig deed and agreement, and the hard-topping and acceptance of that segment of road into the secondary highway system, which was accomplished

prior to 1950 and before Amoco acquired the property adjacent to route 630 and to the 30-foot private road easement, no *necessity* existed for the maintenance of route 630 as then located. Ample means of ingress and egress were afforded Leaman and the other property owners by route 631.

The condition of the 30-foot easement road and the extent of its use were factors that the Board was also entitled to take into consideration when it abandoned route 630 and determined that new route 173 "served the same citizens."

Nor is Leaman's assertion that route 630 was abandoned by the Board solely for the benefit of Amoco justified by the evidence. The abandonment of route 630 and the relocation of 173 was desired by and undoubtedly resulted in benefit to Amoco. Yet under the Tripartite Agreement the Commonwealth acquired full title to a strip of land 80 feet in width on which new route 173 was constructed, in contrast to the 30-foot easement that it formerly had in route 630. Also the benefit that would inure to the public from the operation of the refinery and industry in the area was a circumstance that might be taken into account by the Board when it abandoned and altered roads in the area.

Though inconvenience or hardship may be suffered by some and benefits inure to others because of the alterations and abandonment of the roads, that does not warrant interference by a court.

"The question of the necessity for closing a street or highway, as distinguished from the question of public purpose or use, belongs exclusively to the legislative department of the government. So, it is within the province of the public authorities in whom the power to vacate is vested to determine when it shall be exercised, and their action in this regard will not be reviewed by the courts in the absence of fraud or a manifest abuse of discretion. * * *" 25 Am. Jur., Highways, § 120, p. 418.

We find and hold that secondary route 630 was legally abandoned and primary route 173 altered, improved and relocated as permitted by and in accordance with the provisions of § 33-76.12.

Nowhere in his bill of complaint did Leaman allege that he was entitled to any property rights in route 630 or beyond the southern terminus of the easement. Nor did he assign any cross-error because his easement was not extended to new route 173. Yet he now asserts that Amoco has in effect changed the location of a portion of route 630 and undertakes to profit from its wrong-

ful acts and deny him access to and from Goodwyn's Neck Road. He insists that the purpose and intent of the Lewis-Coleman-Pohlig deed and agreement was to afford him an easement over which to reach route 630, and as Amoco is now the owner of the land formerly occupied by route 630 and that lying between old route 630 and route 173, it should be required to provide an easement for him over its lands so far as necessary to afford him access to route 173. He relies upon *City of Lynchburg* v. *Peters, supra,* where it is said:

"* * * It is well settled in Virginia and elsewhere that a city has no authority to divert public streets or any part thereof to the exclusive use of private interest. * * *" At page 9.

The answer to Leaman's contention is two-fold. First, though Amoco desired and fostered the abandonment of route 630 and the alteration and relocation of route 173, yet it was the Board, acting under legal authority, that made the abandonment and alterations, and new route 173 is used by and serves the public. Secondly, under the Lewis-Coleman-Pohlig deed and agreement, Leaman acquired no private rights in route 630. It expressly granted a 30-foot road easement "out to the public highway known as Goodwyn's Neck Road" as shown on the attached "blueprint map." We find nothing in this instrument which contemplates the enlargement and extension of the easement to a new and differently located public highway in event of a legal abandonment by public authority of portions of route 630, *i.e.,* Goodwyn's Neck Road.

Leaman's lots abut route 631, a public highway, and not the private easement extending southwardly from route 631. In traveling to the Dandy vicinity, he necessarily used route 631 whether he availed himself of the longer route around the elbow in 631 or the shorter by crossing route 631 and then traveling along the 30-foot easement.

"Speaking generally, the obstruction of a public highway is a public nuisance, and the trend of authority is that an individual cannot maintain a bill to enjoin such nuisance unless he can show that he has suffered, or will suffer therefrom, special and peculiar injury or damage to himself, as distinguished from injury or damage to the general public. Moreover, such special and peculiar injury or damage must be direct, and not purely consequential, and must be different in *kind,* and not merely in *degree,* from that sustained by the community at large.

    \*       \*       \*       \*       \*       \*       \*

"The learned chancellor, in a clear and conclusive opinion, shows that though the injury to the plaintiffs, as stated in the bill, may be greater than that sustained by other persons living more remote from the scene of the obstruction, such injury is, nevertheless, greater in degree only, and not in kind." *Bowe* v. *Scott*, 113 Va. 499, 500, 501, 75 S. E. 123. *Blanding, et al.* v. *City of Las Vegas et al.*, 52 Nev. 52, 280 P. 644.

In the closing of route 630 and relocation of route 173, no special injury or hardship has been inflicted upon Leaman as contrasted with the injury or hardship that may be suffered by other members of the public. As to him, as contrasted with the public, the difference in the injury, if any, suffered is not one of kind but of degree. His route by public roads to some areas is longer than it was before the roads were abandoned, relocated and improved, but that inconvenience or hardship is one of degree and does not invalidate the actions of the Board.

■ When route 630 was legally abandoned and closed, was Leaman's easement, which became a mere cul-de-sac as indicated on Figure 6, extinguished by cessation of the purpose for which it was granted?

We have been cited to no Virginia decision in which this principle or doctrine has been applied. Yet in 1 Minor, *Real Property*, 2d ed., §§ 106, 107, pp. 145, 146, it is said:

"Easements once created may be extinguished in the following ways: (1) By a cessation of the purposes for which the easement was created; * * *

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

"If the particular purpose for which the easement is granted is fulfilled or otherwise ceases to exist, the easement also falls to the ground.

"In determining questions of this sort, the terms of the grant, or, if it be implied, the circumstances for which the implication arises, are to be looked to in order to ascertain the scope and extent of the easement * * *."

This principle is recognized in 3 Tiffany, *Real Property*, 3d ed., § 817, p. 368, in the following language:

"It has been said that when an easement is created for a particular purpose, it comes to an end upon a cessation of that purpose, which means, apparently, that an easement which is created to endure

only so long as a particular purpose is subserved by its exercise, comes to an end when it can no longer subserve such purpose. The question then is, in each case, what is the particular purpose to be subserved by the easement, and this, in the case of an easement created by grant is a question of intention."

The extinguishment of easements by cessation of the purpose for which they were granted is recognized in the following texts and decisions: Washburn, *Easements and Servitudes*, 4th ed., pp. 699-703; 17A Am. Jur., Easements, § 162; *Holden* v. *Palitz*, 2 Misc. 2d 433, 154 N. Y. S. 2d 302; *Makepeace Bros., Inc.* v. *Barnstable*, 292 Mass. 518, 190 N. E. 922; *Central Wharf and Wet Dock Corp.* v. *Proprietors of India Wharf*, 123 Mass. 567; *John Hancock, et al.* v. *Philip Wentworth*, 5 Metcalf 446 (46 Mass.); *Town of Freedom* v. *Norris*, 128 Ind. 377, 27 N. E. 869; *Beim* v. *Carlson*, 209 Iowa 1001, 227 N. W. 421.

On the authority of the above decisions and texts, and for the reasons stated, we conclude that Leaman's easement in the 30-foot road extending southwardly from secondary route 631 has been extinguished.

This conclusion renders it unnecessary that we consider the other assignment of error. A decree will be entered denying the relief prayed for and dismissing Leaman's bill of complaint.

*Reversed and final decree.*