# Richmond

## THE CITY OF DANVILLE, ET ALS. V. JAMES A. ANDERSON, STATE HIGHWAY COMMISSIONER OF VIRGINIA.

June 20, 1949.

Record No. 3507.

Present, All the Justices.

The opinion states the case.

*Crews & Clement, Meade & Talbott* and *F. H. Conway,* for the appellants.

*J. Lindsay Almond, Jr., Attorney General, C. Champion Bowles, Assistant Attorney General,* and *Langhorne Jones,* for the appellee.

MILLER, J., delivered the opinion of the court.

A judgment was sought in this proceeding by James A. Anderson, State Highway Commissioner, appellee, against the City of Danville, and others, appellants, declaring that the State of Virginia was entitled to an easement, for highway purposes, sixty feet wide over a stretch of road 2.98 miles long constituting a part of State Highway No. 41 in Pittsylvania county.

From a decree adjudicating that the right of way to which the Commonwealth was entitled was sixty feet in width, appellants obtained this appeal.

What is the correct width of the easement over the stretch of road involved is the sole question presented.

Appellee asserts that the sixty feet determined upon by the trial court is correct, but if not, then under no circumstances can the width be less or other than forty feet.

With equal earnestness, appellants contend that the right of way is only twenty-four feet wide, but if not, they say the evidence fails to establish that it is more than thirty feet.

On February 7, 1817, the General Assembly passed an act entitled, "An Act prescribing certain general regulations for the incorporation of turnpike companies." Acts 1816-

1817, ch. 38, p. 41. It recites at length the manner, mode and conditions under which a turnpike company may acquire, construct and operate toll roads. Among other things, it sets out several provisions that shall "be deemed and taken to be a part of the said charter or act of incorporation * * * except so far as such special grant, charter or act may otherwise expressly provide * * *."

In section 14, which has to do with the width, character and use of the road, it is specifically said "that the President and Directors shall * * * make the said road in every part thereof sixty feet wide at least, eighteen feet of which shall be well covered with gravel or stone, where necessary, and at all times kept firm and smooth * * *; and, on each side of the part so to be made and preserved, they shall clear out a summer road eighteen feet wide, and keep the same always in good repair, * * * fit for the use of wagons and other carriages in dry weather * * *."

Section 7 provided that the company, through its officers and agents, might enter upon land through which they deemed it necessary to lay out a road and lay out the same. If they could not agree with the owner as to terms on which the road was to be opened, the company was authorized to apply to court for appointment of five appraisers to assess the damages that would result from opening the road. Upon ascertainment of the damages sustained by the proprietor of the land, they were required to "certify their proceedings thereupon, to the court * * *."

Under section 17, as soon as each five-mile stretch of road was finished, the company's officials could apply to the county court to appoint three freeholders to examine the road and report whether or not it had been properly completed, and upon approval, the road could be opened to the public and tolls charged for its use.

A hundred and eleven years ago the Pittsylvania, Franklin and Botetourt Turnpike Company was incorporated, subject to the provisions of the general act of 1817. The special act incorporating this company appears as chap. 164, p. 117,

Acts of the General Assembly, 1838. It authorized the company to construct a turnpike road between designated points in Pittsylvania, Franklin and Botetourt counties. Section 2 of the Act reads, in part, as follows:

"That the company may dispense with a summer or side road to their turnpike, and shall not be required to pave or cover their said road with stone or gravel, nor to clear the same wider than forty feet, nor to construct it of a greater width than eighteen feet on steep hill sides, and twenty-four feet in other parts, and that it shall no where exceed a grade of four degrees."

It will thus be seen that this act materially changed the character, width and area which was° to be actually constructed and cleared under the 1817 Act.

Appellee contends that the special act by which the Turnpike Company was incorporated did not change or repeal the general law as set out in the Act of 1817 which directed that the road should be sixty feet wide at least. In brief, he insists that the Act of 1838 in no wise lessened the width provided for by the prior act but merely reduced the width to be constructed, worked and cleared.

Certain orders entered by the county court of Pittsylvania county during 1839 and 1840 appointing commissioners to view the road and report its condition to court were introduced in evidence. They establish that the turnpike was completed. Two reports of the commissioners disclose the condition of fifteen miles of the road, which includes that area now in litigation. One of these reports reads, in part, as follows:

"* * * and report that we find the said section of the road completed in good style not less in our opinion than twenty-four feet wide, nor any place exceeding a grade of four degrees. * * *"

This is the only evidence of record that shows the width laid out and improved for public travel, i. e., twenty-four feet.

Appellee further relies upon the testimony of J. S. Carter,

former road engineer of Pittsylvania county from 1920 to 1932. It was to the effect that the location of the road had not been changed since 1920. As to this point, he said:

"No, there has been no appreciable change in the location * * *," and "generally speaking, the present roadbed is the same location as it has been from the fence lines and old trees it has been maintained there for years and years."

But his further testimony discloses that there was no actual knowledge on his part as to its width; nor does the information secured by him from old residents of the community and recited as a part of his deposition mention a width of sixty feet. It follows:

"Q. When you were supervising for the County and also for the State what was called in your office as being the width of the right of way?

"A. There was always a question as to the exact width, varying from 66 to 132 feet. However, the County—we maintained only a 30 foot right of way.

"Q. But that was what you considered as the whole right of way but you only maintained 30 feet of it?

"A. That is right.

"Q. On what did you base your assumption that it was 66 feet and over?

"A. From various old inhabitants along the road who reported that the old turnpike had a 66 foot right of way and some others maintained that we had a 132 foot right of way."

Obviously this does not help to prove a definite width of sixty feet, nor is it, standing alone, sufficient to establish any other definite width.

Upon comparison of a map made in 1838 of the center line of the then proposed road with an aerial map recently made, the center line of the highway was ascertained with reasonable certainty. Though the center line of State Highway No. 41 is thus established as the center line of the old turnpike, nothing indicates that the width of the road was sixty feet when established or at any other subsequent date.

In fact, the old map is solely a survey of the center line and the nearby topography.

There was no intimation until 1931 that the State Highway Commissioner contended that the width of this road was sixty feet. That was voiced for the first time in a report in the form of a letter in April, 1931, to the State Highway Commissioner from an attorney employed to examine the records of Pittsylvania, Franklin and Botetourt counties for any evidence or data disclosing the width of the Pittsylvania, Franklin and Botetourt Turnpike. His report contains the following: "WIDTH UNCERTAIN— CLAIM 60 ft." It concludes with a statement concerning the charter of the Turnpike Company in which he quotes from section 14 of the Act of the General Assembly of 1817, ch. 38, p. 41, and recommends that claim be made to a width of sixty feet. That part of his report follows:

"The charter of this company requires as effectually as though specifically recited therein, that it 'make the said road in every part thereof, sixty feet wide at least,' and in the absence of any proof to the contrary, I would advise that such width be claimed for this Turnpike."

Appellants insist that at no time until this controversy arose has there been maintained a right of way over this 2.98 mile stretch or near thereto any wider than thirty feet and that the evidence establishes that the extent of the used area was only twenty-four feet. They rely upon the fact that the surfaced and used portion is twenty-four feet wide and the testimony of the county engineer was that the county "maintained only a 30 foot right of way."

It also appears in evidence that outside of a thirty foot right of way and within a sixty foot width, original growth trees, old fences and fence lines for miles disclose the highway to have been no more than thirty feet in width. At points within the stretch of road in controversy, exhibits filed in evidence show that two old wells serving residents along the highway were dug and maintained a few feet from the edge of the twenty-four foot hard surface and barely

outside of a thirty foot width. Other improvements, such as a residence and an old tobacco barn, were erected and stand well within the sixty foot area and only a few feet beyond the thirty foot width. Both natural and erected landmarks of long and continued duration clearly indicate that no acts of dominion or proprietorship have ever been exercised over anything exceeding thirty feet in width.

Though no greater width than twenty-four feet was at any time actually constructed and used by the Turnpike Company, the county of Pittsylvania, or the Commonwealth of Virginia, appellee says that by force of the terms of the Act of 1817, the Turnpike Company, by entry upon and improvement of twenty-four feet, became and was entitled to an easement of sixty feet. He bases his claim to this easement on dedication by the property owners and acceptance by the Company when the road was first established. In his brief, it is said: "This property was not acquired by prescription, deed or adverse possession, but by dedication and acceptance."

Though the act of incorporation of the Turnpike Company was materially different in its requirement as to the road to be constructed and cleared, he insists that the terms of the Act of 1817 which stated that the road should be sixty feet wide at least were not repealed by the later Act of 1838.

Upon abandonment of this road by the Turnpike Company, it was taken over by the county under authority of an act of the General Assembly, February 4, 1876, Acts 1875-76, ch. 39, p. 29. That Act was an amendment and reenactment of sec. 73, ch. 61, Code of 1873. It provided that upon abandonment of turnpike roads, the county court could take charge of them "and assign hands to work them according to the provisions of an act of the General Assembly, approved March twentieth, eighteen hundred and seventy-five * * *." The act referred to of March 20, 1875, which appears as Acts 1874-75, ch. 181, p. 177, in mandatory terms, limited the width of county roads to thirty feet.

Among other things, it provided, "Every road shall be thirty feet wide * * * unless the county court order a different width * * *."

The provision fixing county roads at a width of thirty feet unless ordered otherwise had appeared as a part of sec. 5, ch. 52, of the Code of 1860, which then read: "Every road shall be thirty feet wide unless the county court order it ·to be less."

This provision was continued in force until 1928. By an amendment (Acts 1928, ch. 159, sec. 31, p. 580), a presumption arose in favor of a thirty foot road, and it reads:

"Where a way has been worked by road officials as a public road and is used by the public as such, proof of these facts shall be *prima facie* evidence that the same is a public road. And where a way has been regularly or periodically worked by road officials as a public road and used by the public as such continuously for a period of twenty years, proof of these facts shall be conclusive evidence that the same is a public road. And in all such cases the center of the general line of passage, conforming to the ancient landmarks where such exist, shall be presumed to be the center of the way, and in the absence of proof to the contrary, the width shall be presumed to be thirty feet."

The status of the statutory. law concerning the width of county roads at the time the company abandoned this road and roads to be thereafter acquired by the county justified the belief, if it did not actually require, that the area accepted, which was to be maintained at the expense of the county, be limited to a width of thirty feet. It is a most persuasive circumstance tending to establish that all parts of this right of way in excess of a width of thirty feet were, at the time it was taken over by the county, relinquished and abandoned and thus reverted to the adjacent landowners, leaving the area over which the county exercised an easement at thirty feet.

In our opinion, it is unnecessary to decide whether the provisions of the Act of 1817 were altered or repealed by

the terms of the Act of 1838. At best there is no evidence that more than twenty-four feet were at any time improved or used by the Turnpike Company or either of its successors in interest.

At some period shortly prior to 1880, this company relinquished all claim to the road and interest therein. When taken over by the county, use was made of no greater width than had been previously improved, which was twenty-four feet. There is, however, some evidence that the county claimed or maintained a width of thirty feet. That the claim to use and control thirty feet and no more was fully justified cannot be doubted in view of the statutes then in effect concerning county roads and abandoned turnpikes.

No assertion of right by the county to any width greater than thirty feet was ever made. Landowners along the road were freely allowed to continue to assert their claim to all the area outside of the thirty foot width, and that they did assert and exercise such claim is fully established by the natural and erected landmarks along its course. These circumstances negative the idea that the county ever acquired an easement wider than thirty feet. *Staunton* v. *Augusta Corp.*, 169 Va. 424, 193 S. E. 695.

It therefore becomes unnecessary to decide whether the Turnpike Company, at the time it constructed the road, acquired an easement of sixty feet or forty feet. Whatever width was acquired by the Company, when the county undertook to exercise its right and easement about 1876 or shortly thereafter, it actually continued to work only a width of twenty-four feet.

As the Turnpike Company had only acquired an easement for road purposes, such part or area as was abandoned and not taken over by the county reverted to the abutting landowners. *Marbury* v. *Jones*, 112 Va. 389, 71 S. E. 1124; *Lynchburg* v. *Peters*, 145 Va. 1, 133 S. E. 674, and Elliott on Roads and Streets, 4th Ed., Vol. 2, sec. 1191.

The facts disclosed in the cases of *Virginia Hot Springs Co.* v. *Lowman*, 126 Va. 424, 101 S. E. 326, and *Com-*

*monwealth* v. *Kinzie*, 165 Va. 505, 183 S. E. 190, which, among others, are relied upon by appellee, are materially different from those appearing in this record. In the first of these cases, there were ample facts to prove that acts of proprietorship had continuously been exercised over a width of sixty feet, and the fences and landmarks along the road furnished convincing evidence of that width.

There we find:

"At the time the appellee purchased his land, the pike was enclosed by fences on both sides thereof, and at the time he testified those fences had been there for twenty years or more. Just how long those enclosures had been there does not appear, but the intimations are that they had been there for a much longer period, as no witness speaks of a time when they did not exist. A blue print filed and identified by a surveyor shows the enclosures on both sides of the pike through the land of the contestants, if not for the whole length of the pike, and the appellee purchased his land with these enclosures there and sold off a part of it with this pike or road given as one of its boundaries in each instance, and soil has been dug and removed from the fence corners for repairs to the pike, and the macadam driveway has been widened without objection from any source. This use of the land within the enclosures and especially the location of the fences on each side of the pike in controversy raises a very strong presumption, in the absence of evidence to the contrary, that the adjacent land owners intended to dedicate so much of the land between those enclosures as was reasonably necessary for the convenient and safe operation of the pike." (126 Va. at p. 432.)

In *Commonwealth* v. *Kinzie, supra,* a fee simple title, sixty feet in width, had been acquired by the Commonwealth. There was no controversy concerning the width of the way, but the landowner contended that the State had not located with sufficient definiteness the strip of land over which it claimed a sixty foot easement. These significant facts are recited at page 508 and go far toward establishing that the

location of the road as asserted by the Commonwealth was correct:

"The State introduced as evidence a map of the strip of land showing the road as projected through the lands of the appellees. This map is designated Exhibit No. 3. It shows the termini of the segment of the road it portrays; it shows the lines and course of the old road, as encroached upon and as acquired, as well as the same indicia of the present road, as changed by the State in 1922; it shows the outside lines of both ways as well as the lines of the fences as located along the old road; it shows, between red lines, the old road occupying sixty feet of width * * * ."

There was other evidence to the same effect and the opinion concludes with the following language:

"It follows that we think that the State has shown with sufficient definiteness the location of the strip of land in question, as to which it has the right to the exclusive use and possession."

*Bennett* v. *Chesapeake, etc., Tel. Co.,* 102 W. Va. 382, 135 S. E. 279, in which the decision was adverse to the landowner who claimed ownership of the land which lay outside of the thirty foot width but within a sixty foot width is cited by appellee. The controlling difference between that case and the one at bar is that the evidence offered there by the landowner failed to sustain the burden of proof that was upon him. That sufficient evidence to sustain the contention of the landowner was lacking is shown from the following paragraph of the opinion:

"Whether the road through the lands now in question was condemned, or the right of way purchased or given by the landowners, does not appear. It must be presumed that the statute was complied with in the absence of anything to the contrary. We do not say that the width of this road at the point in question is 60 feet. There may have been deeds or other facts which have changed the width. If there have been, they do not appear in this case. No question of adverse possession arises here. It is not shown how

long plaintiff had possession of his lands, or how long they were fenced in, if fenced. The burden is on the plaintiff to show that the trees were cut on his land to which he had a valid claim."

The affirmative evidence offered by appellants establish that since 1876 or shortly thereafter when the county of Pittsylvania assumed the maintenance of this road, if not ever since the incorporation of the Turnpike Company in 1838, the landowners along this right of way have been in possession of and have actually enclosed and used as their own that part of the sixty foot area which lies outside of a middle thirty foot strip.

Appellee has failed to establish any acceptance, use or control by the county of any easement in excess of thirty feet. The ancient landmarks definitely negative acceptance of any wider area.

The language of Judge Whittle in *Bare* v. *Williams*, 101 Va. 800, 803, 45 S. E. 331, is most appropriate to the facts here proved:

"It is settled law that public highways should be matters of public record, and identified with such reasonable certainty as to apprise the public of their location, and supply them with the means of knowing to what exent they may travel along them without becoming trespassers, and also to make known to individuals how much and what part of their lands have been appropriated to public use."

Section 2039(32), Code, 1942, (Michie), created, under less convincing circumstances, a presumption that the easement for road purposes is thirty feet in width.

The affirmative evidence which is added to and aided by the statutory presumption leaves no doubt that the extent of the easement enjoyed by the Commonwealth is limited to thirty feet. We also consider it sufficient to exclude appellant's first contention that the easement is only twenty-four feet wide.

The width of the easement for road purposes to which appellee is entitled is fixed at thirty feet over and along the

2.98 miles of roadway here in question. The decree is reversed and this proceeding remanded to the lower court with direction that a decree be there entered adjudicating and determining that the width of the easement and right of way is thirty feet.

*Reversed and remanded.*